[No. C000097. Third Dist. Dec. 2, 1987.]

HAROLD H. RICHMOND et al., Plaintiffs and Appellants v. DART INDUSTRIES, INC., Defendant and Respondent.

[Opinion certified for partial publication.†]

---

† Pursuant to rule 976.1 of the California Rules of Court, all portions of this opinion shall be published except for parts II and III of the Discussion.

COUNSEL

Harold A. Berliner, Heller, Ehrman, White & McAuliffe, Weyman I. Lundquist, Peter A. Wald, and Jonathan P. Hayden for Plaintiffs and Appellants.

Severson, Werson, Berke & Melchior, Kurt W. Melchior, Jan T. Chilton, John K. Vincent, Laurie J. Nicholson, Kronick, Moskovitz, Tiedemann & Girard, Adolph Moskovitz, and James E. Thompson for Defendant and Respondent.

OPINION

SIMS, J.—Plaintiffs Harold Richmond and his class of 2,600 purchasers of land at Tahoe-Donner subdivision appeal from a judgment entered in favor of defendant Dart Industries, Inc., following a four month jury trial. The jury returned a general verdict for defendant on plaintiffs' claims that defendant committed fraud and violated the Subdivided Lands Act (Bus. & Prof. Code, § 11000 et seq.) by misrepresenting the availability of water and sewer services at Tahoe-Donner. (All further statutory references are to the Business and Professions Code unless otherwise indicated.) Following the jury verdict the trial court declined to rule on plaintiffs' 10th cause of action premised upon the Unfair Practices Act (§ 17200 et seq.). Faced with the same arguments asserted here, the trial court also refused to enter a judgment notwithstanding the verdict.

Plaintiffs contend that uncontroverted evidence establishes defendant violated the Subdivided Lands Act as a matter of law. Plaintiffs also contend the trial court erroneously found that they waived a court trial of their 10th cause of action. In this published portion of the opinion, we hold that plaintiffs waived the principal theory of recovery asserted on appeal by failing to argue the theory with reasonable clarity to the jury. In an unpublished portion of the opinion, we conclude plaintiffs' remaining contentions are without merit. We therefore affirm the judgment.

FACTS AND PROCEDURAL BACKGROUND

Tahoe-Donner is a recreational home subdivision with approximately 6,000 lots near Truckee in Nevada County. (See *Richmond* v. *Dart*

*Industries, Inc.* (1981) 29 Cal.3d 462, 466 [174 Cal.Rptr. 515, 629 P.2d 23].) Defendant is the successor in interest to Lakeworld Development Corporation, the original developer of Tahoe-Donner. Defendant opened the subdivision in 1971 and sold approximately 2,600 lots by 1976 when this action was filed. (*Id.,* at p. 466.)

Plaintiff land purchasers brought this action as a class action on behalf of all purchasers similarly situated.[1]

Plaintiffs contended defendant misrepresented the availability of water and sewer service to the Department of Real Estate (DRE) and lot purchasers by concealing and failing to disclose information.

Plaintiffs contended defendant should have told purchasers that provision of water was contingent upon defendant's installing and deeding to the Truckee Donner Public Utilities District (TDPUD) a pipe on the bed of Donner Lake to supply water to the subdivision. After defendant began constructing the pipe pursuant to agreements with those owning the water rights, the State Lands Commission asserted the need for a permit and sued defendant for trespass. Defendant suspended sales of lots between July and November 1973.

Defendant's defense was that it made truthful, timely disclosures to the DRE and to purchasers. Defendant presented evidence showing the assertion by the State Lands Commission to a proprietary interest in the bed of Donner Lake was unprecedented and unexpected. Defendant's evidence showed it got conflicting advice on the need for a permit from the Lands Commission, and defendant's independent legal counsel had advised no permit was necessary. Defendant responded to the Donner Lake impasse by developing ground water wells that were ultimately deeded to TDPUD. It is undisputed that no lot at Tahoe-Donner was ever without water.

Plaintiffs also contended defendant concealed and misrepresented the availability of sewer service by the Truckee Sanitary District (TSD) by failing to disclose that (a) sewer connection fees would be required for lot hookups; (b) the subdivision's needs could be satisfied only if a new treatment plant were built; and (c) the new plant would be paid for by lot

---

[1] Our Supreme Court reversed the trial court's class decertification order (*Richmond, supra,* 29 Cal.3d at p. 479) and the case went to trial with the plaintiff class consisting of all who purchased lots before December 31, 1975, less those who opted out or who requested separate representation. The plaintiff class is divided into two subclasses: (1) those purchasers who retained their lots following disclosure of the water and sewer system difficulties; and (2) those who stopped payments on their lots and lost them through foreclosure or who deeded them back to defendant in lieu of foreclosure assertedly because of problems with water and sewer.

purchasers through greatly increased connection fees. In 1973, the Lahontan Regional Quality Control Board prohibited all within its region from making any new sewer connections. Defendant brought its sewage disposal difficulties to the DRE's attention and in June 1975, the DRE banned lot sales at all subdivisions in the area, including Tahoe-Donner. DRE's sales ban was lifted eight months later, in February 1976.

Defendant's defense was that it had obtained a will-serve letter from TSD, that neither connection fees, the construction of new facilities, nor the sewer hookup ban were originally foreseeable, that the $250 per lot hookup fee imposed in 1971 was standard in the business and did not have to be disclosed to DRE, and that, when known, connection fees were disclosed to purchasers.

With respect to a subclass of those who purchased lots and never sold them, defendant presented an additional defense: that they were not damaged because their lots increased in value.

With respect to a subclass of those who rescinded or whose lots were foreclosed upon, defendant presented evidence that the named representative plaintiffs did not stop their purchases because of water and sewer problems but rather because of personal problems and expectations they would recover in the then-pending lawsuit against defendant.

Further facts will be recited as necessary.

DISCUSSION

I

*Plaintiffs may not change their theory of the case on appeal.*

 Plaintiffs impliedly concede substantial evidence supports the jury's verdict on their causes of action premised on common law misrepresentation. They argue the evidence shows without dispute that they are entitled to damages and/or restitution because defendant violated the Subdivided Lands Act. Plaintiffs acknowledge their contention is a recasting of the argument that no substantial evidence supports the defense verdict.

Plaintiffs claim uncontradicted evidence establishes defendant violated that act by falsely representing to plaintiffs that: (1) water service to the subdivision was provided by TDPUD when, in fact, TDPUD was not providing water to the subdivision and had not accepted defendant's water supply facilities for maintenance and service; and (2) TSD would provide

sewage treatment service to the subdivision when, in fact, defendant knew TSD's ability to serve the 6,000-lot subdivision depended on construction of a new regional sewage treatment plant that had yet to be funded or constructed and that would be paid for by lot purchasers. (See § 11022; Cal. Admin. Code, tit. 10, § 2799.1.) These claims are premised on representations contained in a "fact book" distributed to prospective purchasers of lots. It stated in pertinent part: "Water: Water is provided by the Truckee-Donner Public Utility District." "Sewage Disposal: Approximately 60 miles of sewer lines will be installed by the Developer. The property is served by the Truckee Sanitary District."

Defendant contends plaintiffs are asserting on appeal a new theory of recovery never properly tendered in the trial court. We agree.

■ "The rule is well settled that the theory upon which a case is tried must be adhered to on appeal. A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant. [Citation.]" (*Ernst* v. *Searle* (1933) 218 Cal. 233, 240-241 [22 P.2d 715]; see *Bogacki* v. *Board of Supervisors* (1971) 5 Cal.3d 771, 780 [97 Cal.Rptr. 657, 489 P.2d 537]; *Bank of America* v. *Cory* (1985) 164 Cal.App.3d 66, 78, fn. 4 [210 Cal.Rptr. 351]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 316-323, pp. 327-334.) "Application of the doctrine may often be justified on principles of estoppel or waiver." (9 Witkin, *op. cit. supra,* § 316, p. 328.) The doctrine has been applied where a plaintiff on appeal asserts liability premised on a different negligent act from that at issue at trial. (See, e.g., *Eger* v. *May Department Stores* (1953) 120 Cal.App.2d 554, 561 [261 P.2d 281]; *Mattson* v. *Hollywood Turf Club* (1950) 101 Cal.App.2d 215, 220 [225 P.2d 276].) Whether the rule is to be applied is largely a question of an appellate court's discretion. (*Canaan* v. *Abdelnour* (1985) 40 Cal.3d 703, 722, fn. 17 [221 Cal.Rptr. 468, 710 P.2d 268].)

■ Here, as we shall explain, plaintiffs' theory on appeal is at variance from their theory at trial in the following respects: (a) on appeal plaintiffs assert misrepresentations are located in statements in a "fact book" distributed to purchasers whereas at trial plaintiffs relied on different statements in public subdivision reports; and (b) on appeal plaintiffs assert a misrepresentation may be located in the statement that water was provided *by TDPUD,* whereas at trial plaintiffs contended defendant misrepresented the *availability* of water without focus on whether a public or private entity was to supply it.

To set the stage for plaintiffs' claims at trial, we review certain pretrial procedural matters.

Plaintiffs' sixth amended complaint, on which the case went to trial, pled two claims under the Subdivided Lands Act (hereafter Act). Plaintiffs pled statutory violations specifically throughout their complaint. In their first claim under the Act, plaintiffs pled in detail that defendant had supplied false information to the DRE and such information was relayed to the public in DRE subdivision reports, all in violation of section 11010.[2] In their second claim under the Act, plaintiffs reiterated allegations that defendant made misrepresentations to the DRE and therefore violated section 11025.[3] The complaint nowhere pled a violation of section 11022.[4] Moreover, the complaint pled, "Said public reports were misleading and deceptive in that they failed to warn prospective purchasers . . . that . . . lots . . . would not be supplied with an adequate amount of water."

Putting aside the question whether other more general allegations in the complaint were technically sufficient to tender plaintiffs' "fact book" claims, the complaint makes clear that plaintiffs' principal *pleaded* theory was that defendant violated the Act by making misrepresentations to the DRE that were, in turn, passed on to purchasers in public subdivision reports. The pleaded misrepresentation concerning water was its adequacy, not its source.

---

[2] As applicable to this case, section 11010 provided in pertinent part: "Prior to the time when subdivided lands are to be offered for sale or lease, the owner, his agent or subdivider shall notify the commissioner in writing of his intention to sell or lease such offering.

"The notice of intention shall contain the following information:

". . . . . . . . . . . . . . . .

"(f) A true statement of the provisions, if any, that have been made for public utilities in the proposed subdivision, including water, electricity, gas, telephone, and sewerage facilities." (Stats. 1969, ch. 482, § 19, pp. 1084-1085.) The statute has since been amended.

[3] Section 11025 provides in pertinent part: "In addition to the other grounds for denial of a public report as set forth in this chapter, the commissioner shall not issue a public report on any land project within the purview of Section 11000.5, as modified by Section 11000.6, unless he makes a specific finding that: "(1) The total complex of existing or proposed improvements reflected in the subdivision offering (including storm sewers, sanitary sewers, water systems, roads, utilities, community facilities, recreational amenities) will be adequate to serve the projected population of the entire land project.

"(2) The arrangements that have been made to assure completion, maintenance and financing of the total complex of existing or proposed improvements referred to in paragraph (1) are reasonable. In determining the reasonableness of such arrangements, the commissioner shall consider whether the probable continuing financial burden with respect to the financing of completion and maintenance of improvements within the subdivision bears a reasonable relationship to the value of the lots therein."

[4] Section 11022 provides in pertinent part: "It shall be unlawful for any owner, subdivider, agent or employee of such subdivision or other person with intent directly or indirectly to sell or lease subdivided lands or lots or parcels therein, to authorize, use, direct or aid in the publication, distribution or circularization of any advertisement, radio broadcast or telecast concerning subdivided lands, which contains any statement, pictorial representation or sketch which is false or misleading."

This theory was tendered to our Supreme Court in plaintiffs' quest for class certification. Ordering certification, the court said: "Each individual who purchased a lot at Tahoe Donner was given a copy of the Final Subdivision Public Report. That report gave assurances that there would be an adequate water supply, sewage treatment and recreational facilities for the entire development. It is the alleged violation of these assurances upon which plaintiffs base their suit." (*Richmond* v. *Dart Industries, Inc., supra,* 29 Cal.3d at p. 467.)

Once again, in their trial brief, plaintiffs described their claims under the Act. Although at one point plaintiffs cited section 11022 in a summary of provisions of the Act, they characterized their claims as follows: "Tahoe Donner is a 'subdivision' as defined in Section 11000 of the Subdivided Lands Act, and is a 'land project' as defined in Section 11000.5 of the Act. Therefore the project's subdivider, [defendant], was required to comply with the requirements of the Act in offering Tahoe Donner lots for sale. Plaintiffs contend that defendant has breached its statutory obligations under Sections 11010, 11011, 11012, 11018, and 11025, outlined above. [¶] *The gravamen of plaintiffs' statutory contentions is that [defendant]'s submissions to the DRE, and the consequent public report, contained false, incomplete, and misleading statements concerning [defendant]'s intention and ability to provide adequate sewerage, water, and recreational amenities, as advertised to prospective purchasers.* The Public Report initially issued by the DRE June 7, 1971, in reliance on [defendant]'s representations, was distributed to plaintiffs, who in turn relied on its contents in purchasing their lots." (Italics added.)

Although an appendix to plaintiffs' trial brief included the "fact book" among numerous documentary exhibits to be introduced at trial, the trial brief made no attempt to identify the significance of the "fact book" nor to tie it to any violation of the Act.

In his opening statement to the jury, plaintiffs' counsel dwelt at length on an asserted conspiracy by defendant to hide the unavailability of water and sewer service from purchasers by making alleged misrepresentations to the DRE. The "fact book" is not mentioned in the opening statement, nor is the argument made that defendant violated the Act by representing that TDPUD, rather than defendant, was providing water.

During trial, various lot buyers testifed that they read and relied upon public subdivision reports. By way of contrast, although several lot purchasers testified they *received* the "fact book," *only one,* John Foster, testified he

thought he had read it.[5] Foster testified it did not make any difference to him whether water came from a well or a creek or Donner Lake, as long as there was water. He testified water had always been available. No lot purchaser, including Foster, testified that he or she had relied on the "fact book" in making a purchase. Nor did any lot purchaser testify that he or she thought that any statements in the "fact book" were false.

It is apparent that, in the context of this epic trial drama, the "fact book" appears briefly like a spear carrier in several scenes. In light of the wholly insignificant role the "fact book" played in this protracted litigation (in which more than 400 documentary exhibits were in evidence), we think that if plaintiffs wanted the jury to return a verdict premised on statements in the "fact book," plaintiffs had an obligation reasonably to explain to the jury their theory of the case.

Plaintiffs' contention that the verdict is unsupported by the evidence is necessarily a claim of jury error. In a jury trial it is the duty of the jury to determine the true facts from the evidence and to apply the rules of law set forth in the instructions to the true facts to arrive at a verdict. (See Code Civ. Proc., § 608; *Henderson* v. *Los Angeles Traction Co.* (1907) 150 Cal. 689, 696-697 [89 P. 976]; *Gipson* v. *Davis Realty Co.* (1963) 215 Cal.App.2d 190, 202 [30 Cal.Rptr. 253]; *Bowen* v. *Sierra Lumber Co.* (1906) 3 Cal.App. 312, 324-325 [84 P. 1010]; cf. CALJIC No. 1.00 (1979 rev.).) By claiming the verdict is wrong, and by making no challenge to the jury instructions, plaintiffs necessarily claim that the jury failed to do its duty under the instructions.

However, we do not believe a lay jury could be reasonably expected to ferret out plaintiffs' theory of recovery unaided by argument. Given the magnitude of the trial, we think plaintiffs had an obligation reasonably to inform the jury in argument about its current theory of the case by identifying the evidence upon which it relied and by connecting that evidence to a theory of liability tendered in the instructions. "The importance of the closing argument increases in almost a direct ratio with the length of the trial and the amount of controversy over the facts. Although the importance of certain testimony may be obvious to an attorney, it does not necessarily follow that it will be obvious to the jury. Especially in long and complicated cases, the nuggets of important facts may, to the layman juror, remain buried in the sands of trivial and conflicting testimony. It is the closing argument that must collect the important facts and expose them to the view of the jury in a logical and unified pattern that they will want to

---

[5] When asked whether he read the "fact book" before he decided to buy, Foster testified, "Yes, I think so."

accept and believe. [¶] No less important than clarifying the facts of the case is the clarification of the issues. Even though in counsel's opening statement he may have clearly spelled out the issues in the case, by the time of the closing argument, there may be jurors who either misunderstand the issues or simply do not remember the issues at all. As the closing arguments will be one of the last things the jury hears before retiring to consider their verdict, a clear restatement of the issues in their simplest terms can make a lasting impression on the jury. Likewise, counsel's comments and relation of the testimony to the judge's instructions to the jury, or in a jurisdiction where his instructions follow closing argument, his anticipated instructions, may have a major effect on the jurors." (Figg et al., Civil Trial Manual (Amer. College of Trial Laws. & ALI-ABA Joint Com. on Cont. Legal Ed. 1974) p. 444; see Purver et al., Cal. Trial Handbook (2d ed. 1987) § 22:2, pp. 697-698; Holmes, Opening Statements and Closing Arguments (1982) p. 110; Brosnahan, Trial Handbook (1974) § 319, p. 399.)

Plaintiffs did not reasonably inform the jury about the theory now asserted on appeal. As we have noted, no mention of the theory was made in plaintiffs' opening statement. Nor was the theory argued with reasonable clarity in plaintiffs' closing argument.

In the first half of his closing argument to the jury, plaintiffs' counsel argued the theory, described above, premised on defendant's failure to make truthful disclosures to the DRE, resulting in misleading public subdivision reports. Counsel made no reference to the "fact book" nor to any theory of misrepresentation premised on defendant's, rather than TDPUD's, supplying water. Consequently, in his closing argument, defendant's counsel commented briefly that "there's really nothing about that fact book that anybody said anything about, other than that it said sewer and water service will be provided. And that's—it doesn't go into any other detail, so there wasn't anything more said on that than what was said to the department, actually less. [¶] So I don't think that fact book means anything in the case. [Plaintiff's counsel] certainly didn't allude to it in his closing statement."

In the lengthy rebuttal half of his closing argument, plaintiffs' counsel merely mentioned the "fact book" once in passing[6] and asked the jury to

---

[6] In support of his argument that defendant knew about inevitable higher sewer connection fees but failed to disclose them, plaintiffs' counsel stated: "So that information [about likely higher sewer connection fees] was distinctly there. It turned out to be a reality, and Dart knew about it, and it was disclosed to them.

"Now, in come rejoinder to this [sic], trying to get around the fact that this was never mentioned in the Department of Real Estate materials, wasn't told to the Department of Real Estate, it wasn't in the fact book, and again, I submit to you what was there conveyed the opposite impression, said you're going to get sewer when you need it. Truckee Sanitary District—

look at it, together with numerous other exhibits, in the jury room. Counsel did not identify any language in the book upon which plaintiffs relied and made no effort to relate any statements in the book to the jury instructions.

It is evident plaintiffs never argued their current theory of recovery to the jury in a way that reasonably informed the jury of the theory.

■ We recognize that an appellate court may allow an appellant to assert a new theory of the case on appeal where the facts were clearly put at issue at trial and are undisputed on appeal. (*Panopulos* v. *Maderis* (1956) 47 Cal.2d 337, 341 [303 P.2d 738].) However, "if the new theory contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at trial the opposing party should not be required to defend against it on appeal. [Citations.]" (*Ibid.*) **(1c)** Here, given the procedural history of the case recounted above, we cannot say defendant was reasonably put on notice to present all its evidence surrounding the "fact book" at trial.

Moreover, even assuming for purposes of argument the issue now advanced on appeal is one of law, we would not entertain the claim, on the policy ground that plaintiffs ought not have two trials where they could have had but one. (See *Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 143 [181 Cal.Rptr. 732, 642 P.2d 792] [issue of bias of administrative board could not be raised for first time on appeal because trial court should decide question in first instance].) Plaintiffs impliedly suggest that, should they prevail, no new trial would be necessary. They ask us to enter judgment in their favor for $1.9 million. However, they cite no authority for such a disposition of the cause, nor are we aware of any.

■ "Before an appellate court may make new findings as the basis of a reversal, with directions to enter judgment for appellant . . . 'it must appear from the record . . . that on no theory grounded in reason and justice could the party defeated on appeal make a further substantial showing in the trial court in support of his cause.' (*Tupman* v. *Haberken* (1929) 208 Cal. 256, 269 [280 P. 970]; see *Lockheed Aircraft Corp.* v. *County of Los Angeles* (1962) 207 Cal.App.2d 119, 132 [24 Cal.Rptr. 316].) ■ The ordinary disposition upon a finding by the appellate court that the evidence is insufficient to support the verdict is simply to reverse, giving the respondent a right to a new trial." (*Boyle* v. *Hawkins* (1969) 71 Cal.2d 229, 232, fn.

---

there's bond up, Truckee Sanitary District will provide it. It looks exactly like you're going to get it.

"When they knew all these things, it should have been all the more disclosed when they are indicating affirmatively the details behind it. But rather they suggest to you that the lot owners got some sort of packet or some people did."

3 [78 Cal.Rptr. 161, 455 P.2d 97].) As we have explained, we cannot say defendant presented all substantial evidence at its disposal on the theory now asserted. Moreover, where, as here, the jury never reached the issue of the amount of any monetary recovery due plaintiffs, the appropriate remedy upon a finding of lack of substantial evidence to support a defense verdict would be to reverse the judgment to allow a retrial. (*Steelduct Co.* v. *Henger-Seltzer Co.* (1945) 26 Cal.2d 634, 648 [160 P.2d 804]; see *Gray* v. *Brinkerhoff* (1953) 41 Cal.2d 180, 186 [258 P.2d 834]; *Krause* v. *Apodaca* (1960) 186 Cal.App.2d 413, 420 [9 Cal.Rptr. 10].)

We dare say it takes no citation of authority to recognize that California's trial courts are limited public resources subject to overwhelming demand. Plaintiffs occupied a superior court trial department for over four months. Having failed to tender their "fact book" theory with reasonable clarity to the jury, plaintiffs waived the theory and may not try the case anew. Plaintiffs fairly had their chance.

## II-III*

. . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Carr, Acting P. J., and Sparks, J., concurred.

Appellants' petition for review by the Supreme Court was denied February 17, 1988.

---

* See footnote, *ante,* page 869.