[No. A082437. First Dist., Div. Four. Oct. 25, 2000.]

GEORGE HEINER, Plaintiff and Respondent, v.
KMART CORPORATION, Defendant and Appellant.

## COUNSEL

Ropers, Majeski, Kohn & Bentley, Mark G. Bonino, Timothy K. Branson and Cristina M. Baroga for Defendant and Appellant.

Bernard, Balgley & Bonaccorsi, Steven M. Bernard, David P. Bonaccorsi; Law Office of Daniel U. Smith, Daniel U. Smith and Ted W. Pelletier for Plaintiff and Respondent.

## OPINION

**SEPULVEDA, J.**—Kmart Corporation (Kmart) timely appeals from a final judgment, entered after a jury trial, by which Kmart was held liable for negligence, battery, and negligent infliction of emotional distress, and ordered to pay compensatory damages totaling $3.8 million to respondent George Heiner, a dentist who was injured in an altercation with a Kmart security guard.[1] Kmart contends that the trial court erred by (1) excluding evidence that Heiner was operating his dental practice in violation of certain provisions of the Business and Professions Code and was, thus, not entitled to certain "lost profits" he claimed at trial; (2) excluding evidence of Heiner's involvement in other physical and verbal altercations; (3) declining to apply principles of comparative fault to allocate the damages resulting from the battery; and (4) deciding the issue of the security guard's agency relationship with Kmart as a matter of law. Finding no reversible error in the trial court's rulings, we will affirm.

---

[1]The jury rejected Heiner's claim for false imprisonment, and declined to impose punitive damages in connection with any of the causes of action for which Kmart was found liable.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  *The Underlying Incident.*

At approximately 9:00 p.m. on March 11, 1995, Heiner went to the Kmart store in Livermore to return a telephone for a refund. Heiner proceeded immediately to the customer service desk and asked representative Elizabeth Dalziel for a refund. Heiner did not return the phone in its original box, but assured Dalziel that he had not used the phone. Dalziel asked Heiner for a cash register receipt, but Heiner had only a credit card receipt which plainly showed it was for the purchase of a phone from the Livermore Kmart store. However, Dalziel refused to give Heiner a refund noting that, under Kmart's new 90-day refund policy, Heiner had "taken too long" to return the item.[2] At Dalziel's suggestion, Heiner filled out a green refund slip. Dalziel then called the store manager for "approval."

Gloria Cox, the acting "assistant store manager" in charge of the store that night, told Heiner that because he did not have a receipt, the store manager would have to make the final decision regarding a refund and would contact him the next day. Unbeknownst to Heiner, Cox "slid the green slip into the register" for delivery to the store manager.

Heiner testified that he was frustrated, but never threatened Cox or Dalziel in any way, and was never "out of control" or "yelling." Dalziel said she never felt threatened by Heiner, and both Cox and Dalziel testified that Heiner was not "screaming" or "out of control." Cox said she knew Heiner's frustration was not directed at her personally, but rather at "the policy and the store."

As Heiner was talking to Dalziel, he noticed a man standing behind him. Heiner did not know who the man was, but believed him to be a "gang member" because he was unshaven, had scraggly blond hair and a tattoo, and was wearing earrings, a nose ring, army boots, a red bandanna, a black leather jacket with spike studs, dark pants, and a dark shirt with a skeleton on it. Heiner said the man looked "scary" and made him feel "awkward." Although the man was not wearing any Kmart identification, he was in fact an on-duty Kmart employee, "loss control associate" Michael Renehan.

---

[2] In November 1994, Kmart had begun notifying customers of a new refund policy under which electronic items could be returned for a refund within 90 days with a sales receipt but, after 90 days or without a sales receipt, no refund could be given. Further, gift items could be returned without a receipt if the item was in brand new condition and still in stock, but Kmart reserved its right to refuse any refund. This policy went into effect on February 1, 1995.

Renehan admitted that "nobody called him over" to the customer service desk. Rather, he went there "by [him]self." He moved within two feet of Heiner, standing right "next to him," but did not identify himself or say anything.

Having been told that he would have to talk to the store manager the next day, Heiner said he "simply asked for [his] refund slip back" but Cox and Dalziel did not give it to him. Heiner thought Cox and Dalziel were trying to hide his refund slip from him. On the counter, Heiner saw a spindle with green refund slips. Thinking his slip might have been placed there, Heiner reached down and picked up the spindle after "announcing" his intent to do so by saying "well, maybe it's in here." Heiner said he wanted to look through the forms on the spindle for his refund slip. He did not want to leave his slip—which contained personal information including his name, address, and telephone number—with the Kmart employees.

Cox testified variously about Heiner's attempt to retrieve his refund slip. At one point, she said Heiner simply "leaned over the counter" and "reached out and grabbed the spindle." She said that she was not "afraid at all for [her] physical safety," and that Heiner did not get on the counter top or "fly" at her or "take any aggressive action." Citing only one portion of Cox's testimony, however, Kmart describes Heiner as having " 'lunged' over the counter" to retrieve his refund slip.

Heiner testified that while he was standing by the counter looking for his refund slip among those on the spindle, Renehan attacked him without provocation and without identifying himself as a Kmart security guard. Renehan "immediately yanked [Heiner's] right arm," and "grabbed [Heiner's] right forearm and very quickly pulled it back in . . . a way that caused extreme pain to [his] shoulder." Heiner immediately dropped the spindle "inside the store," but Renehan continued to pull Heiner's arm until it was behind his back. All this happened very quickly and caused Heiner to "scream[] out in pain."

Dalziel and Cox corroborated much of Heiner's testimony about the attack by Renehan. In particular, these Kmart employees testified that Renehan was the first to use physical force, and that he did so before identifying himself as a Kmart security guard. Even Renehan admitted he did not identify himself before the altercation began. Cox testified that Heiner "looked startled" when this unidentified "gang member" grabbed him, and that Heiner pushed Renehan away. Heiner denied that he ever punched Renehan.

Cox testified that Renehan punched Heiner "in the upper chest, stomach area." Renehan still did not identify himself as a Kmart security guard.[3]

After Heiner dropped the spindle, he "tried to flee" toward the exit, but Renehan jumped on him and bear-hugged him when they got through the doors. Renehan "tackled" Heiner to the floor, placed his knees on Heiner's biceps, and sat on Heiner's chest. Heiner wiggled away but Renehan caught him and threw him three times against the store's glass doors "very quick and hard," slamming his back, head, arm, and shoulder. Heiner then "rolled out towards the sidewalk," where Renehan "tripped" him, so that he "fell completely on [his] left wrist" and his head "slammed to the concrete," rendering him "momentarily unconscious." When Heiner awoke, Renehan again had Heiner's arms pinned against the ground with his knees. Only then, for the first time, did Renehan show Heiner a badge and identify himself as "security." Up to that point, no one had told Heiner that Renehan worked for Kmart.

Heiner told Renehan to let him go because he did not have anything that belonged to Kmart, but Renehan said he would detain Heiner until the police arrived. When a police officer arrived, he lectured Renehan on his behavior and his gang-like appearance, and told Renehan he had let things get way out of hand. As the officer lectured him, Renehan just stood there, saying nothing. The officer released Heiner.

Subsequently, Cox told Renehan his attack was "stupid," and that he had "blown it big time," and that she would not be surprised if Heiner sued Kmart. When Cox made these comments, Renehan just looked at her and "didn't really say too much." Renehan asked Cox to lie by falsely reporting that Heiner "was out of control." Cox was so upset by Renehan's request that she told him to "get out of my f - - - ing face."

Kmart's loss control district manager David Coyle told Renehan that he had violated Kmart loss control guidelines, and that Heiner's interaction with Cox and Dalziel "wasn't any of his business." More specifically, Coyle testified that Renehan's use of force violated Kmart's policy for dealing with "belligerent" refund customers, which was simply to "advise the subject to leave or they would be arrested for trespassing." Renehan did not disagree with Coyle when told he had violated this policy. Coyle also told his subordinate Louis Budjan, a loss control manager, that Renehan was "out of

---

[3]In her deposition, Dalziel clearly testified that Renehan was the unprovoked aggressor in the altercation with Heiner. At trial, however, Dalziel testified that Heiner turned and slugged Renehan in the stomach after Renehan touched Heiner's right shoulder from behind. Dalziel admitted that she "rethought" her testimony after meeting with counsel for Kmart.

line." The manager of the Livermore Kmart store, John Nichols, said that Renehan should have been disciplined.

According to Heiner's security expert, John Christman, Renehan's use of force to recover the spindle violated additional Kmart policies, including one that says, "<u>Note</u>: . . . There is nothing that any store sells that is worth sustaining an injury to recover!" Renehan knew that the telephone was not stolen, and that the spindle had a value of less than $5. Thus, Renehan also violated a policy against detention of a suspected thief "if the value of the merchandise that was taken was $5 or less." Christman also testified that as to suspects who cannot be controlled with "a holding force," Kmart policy requires its loss control agents to "let them go." Renehan also violated Kmart security guidelines by getting involved in a refund dispute without the request of store managers, by failing to identify himself by name and as a Kmart employee, and by approaching Heiner from behind and startling him. Kmart produced no security expert to challenge Christman's opinions.

B.   *The Evidence Relating to Damages.*

There was ample evidence to support Heiner's claim that he suffered serious personal injuries and substantial economic losses as a result of the altercation with Renehan on March 11, 1995. Various medical experts opined that Renehan inflicted a disabling shoulder injury upon Heiner that had not healed after two years of treatment (including surgery), and effectively ended Heiner's career as a dentist. For purposes of this appeal, the only material dispute was over the precise amount of damages to be awarded to compensate Heiner for his injuries and, in particular, for his "lost profits."

In that regard, Heiner offered his own testimony and that of Dr. Robert Gartrell, a dentist and certified business appraiser who is recognized by the American Dental Association as an expert in the appraisal of dental practices. Without objection from Kmart, Dr. Gartrell used charts to show projected losses from what had been a profitable and rapidly growing dental practice. Dr. Gartrell's opinions were based on the financial history of Heiner's practice—which had grown from one office in Union City in 1990 to include a second office in Livermore in 1993 and a third office in San Ramon in 1994—and evidence showing the decline in the practice after Heiner was injured and could no longer treat patients himself or invest as much personal energy in the management of the three offices. Indeed, by the time of trial, Heiner had closed his San Ramon office because it had been losing money. The other two offices remained open, but he believed he would not be able to keep them open because they, too, were losing money.

Using a "conservative" rate of growth of 15 percent per year for the period from March 1995 through the date of trial in December 1997, and much

lower growth rates for the years 1997 to 2022, Dr. Gartrell concluded that Heiner's practice would have generated gross revenue ranging from $1.12 million in 1997 to $2.23 million in 2022, with revenues totaling approximately $12 million during Heiner's expected work life. Dr. Gartrell calculated the present value of those lost profits to be approximately $8 million.

## C. *The Jury's Findings and Verdict.*

After being instructed about the "merchant's privilege," the jury found that Renehan had committed a battery against Heiner, that the battery caused Heiner injury or damage, and that Renehan's conduct was not "privileged under the law for self protection or to prevent escape of the person being detained or loss of property." Kmart did not request a jury instruction or a special verdict form directing the jury to apportion responsibility for Heiner's injuries to the extent they were inflicted in the course of an unjustified battery. Indeed, at the conference on jury instructions and verdict forms, Kmart's counsel agreed that the special verdict form should not apply comparative negligence principles to Kmart's liability for battery. Subsequently, when the trial judge was reviewing the verdict forms, Kmart counsel voiced no objection to the absence of an entry about comparative fault under the battery cause of action.

The jury also found that Renehan negligently inflicted emotional distress upon Heiner, and that Kmart was 75.6 percent at fault for injuries attributable to that claim. The jury further found that Kmart was "negligent," and that it was 77.5 percent responsible for injuries attributable to that claim. The parties stipulated that the general negligence instructions encompassed negligent hiring, training, supervision, and retention.

The evidence of negligent hiring included proof that Kmart hired Renehan based on a partially completed application that failed to list any references as requested, that gave only two years of employment history instead of the ten requested, and that failed to provide complete addresses for past residences. Kmart also failed to investigate Renehan's prior experience, from which it would have discovered that he was fired from several jobs and kicked out of high school in the 11th grade. Based on Renehan's troubled work history, several Kmart witnesses—including local, regional, and national loss control managers—gave testimony suggesting that Kmart should not have hired him. Heiner's security expert, Christman, also testified that hiring Renehan was "dangerous" because it put "an unknown quantity" in "a position where he was going to be detaining people and arresting people." Thus, Christman opined that by hiring Renehan, Kmart did not meet the industry standard of care.

Evidence of negligent training included an admission by Kmart's national director of loss control operations that Renehan's training "fell through the cracks." There was testimony about Kmart's customary procedures for training loss control associates. An associate was to review documents and videos, conduct "supervised detentions," and receive evaluations 30, 60, 85, and 90 days after hiring. But there was no proof Renehan completed these procedures. Budjan and Renehan both admitted that Renehan was evaluated only once, immediately after he received training.

Evidence of negligent supervision and retention included proof that the Livermore Kmart store had no loss control manager to supervise Renehan, someone who might have observed Renehan's gang-like dress and responded to numerous complaints Kmart received from customers and other Kmart employees in the seven months preceding the attack on Heiner. For example, Cox had told Kmart operations manager David Boller that Renehan was a "time bomb ready to go off," and "a lawsuit ready to happen." Cox said that Renehan's attack on Heiner was just the type of incident about which she was concerned. Cox's concern was sparked by incidents in which Renehan jumped on the back of one of two men he suspected of stealing golf balls; grabbed the arm of a 13-year-old girl he suspected of stealing and dragged her back into the store without identifying himself and without a backup witness; and followed a lady into the parking lot and tried to "pick her up" off the ground. Cox said she complained about these incidents to Nichols and to Boller. Boller testified about another incident in which Renehan was "too aggressive" with a customer who did not speak English whom he suspected of shoplifting. Nichols, too, knew of several complaints from Kmart employees about Renehan's habits of dressing "like a gang member," and "harass[ing]" people, but did not criticize Renehan to Coyle. The evidence showed that Kmart never disciplined Renehan for any of his aggressive confrontations with customers; indeed, one month after Renehan attacked Heiner, Kmart promoted him to loss control manager.

The jury found that the total amount of damages suffered by Heiner as a result of "the incident involved herein" was $3.8 million. Kmart did not request a special verdict breaking down the five elements of damage— medical expenses, past loss of ability to work, present value of lost future "earning capacity," pain and suffering, and emotional distress resulting from financial injury—about which the jury was instructed.

D. *Posttrial Proceedings.*

The jury returned its verdict on January 23, 1998, and was dismissed. Four days later, on January 27, 1998, Kmart for the first time raised the issue of comparative fault and apportionment of damages for battery.

## II.

## DISCUSSION

### A.  *The Award of Compensatory Damages Was Supported by Substantial Evidence.*

Kmart's principal contentions on appeal relate to the amount of compensatory damages awarded by the jury, in particular that portion of the damages awarded for future "lost profits." Specifically, Kmart claims the trial court abused its discretion by excluding evidence that Heiner was operating his dental practice in violation of certain provisions of the California Business and Professions Code. Kmart argues that this evidence would have entirely precluded an award of "lost profits." Kmart further contends that Dr. Gartrell's testimony should have been excluded on the ground that it was speculative. We will discuss these issues in turn.

### 1.  *The Trial Court Did Not Abuse Its Discretion by Excluding Evidence That Heiner Was Operating His Dental Practice in Violation of Certain Provisions of the Business and Professions Code.*

Kmart moved in limine to "exclude all evidence regarding plaintiff's lost profits," arguing that Heiner's failure to comply with some of the statutory provisions governing licensing of dental practices should "preclude [him] from recovering any economic damages on the lost wage claim." Kmart cited statutory requirements that a dentist (1) apply to the Board of Dental Examiners (Board) for any additional office, (2) register any additional office with the Board, and (3) be in attendance at each office 50 percent of the time. (Bus. & Prof. Code, §§ 1650, 1658, 1658.1.)

Kmart waived this claim of error by failing to make an offer of proof—as requested by the trial court—that the alleged licensing deficiencies were likely to lead to disciplinary proceedings that would have resulted in disgorgement of profits received by the improperly licensed business locations after Heiner was injured, or would have reduced future profits. (See Evid. Code, § 354, subd. (a).) Kmart offered no declaration or testimony from a member of the Board or other qualified expert on matters of code enforcement. It did not make a showing that the licensing issues would trigger adverse action by the Board, what that action would be, or that Heiner would be unable to mitigate or avoid any penalties by achieving compliance. It was quite clear—as Heiner's counsel argued—that the Board would have had to follow exhaustive administrative procedures that protect licentiates as a matter of due process and the requirements of the Administrative Procedure

Act (Gov. Code, § 11340 et seq.). Dr. Gartrell, who had followed Board actions closely for over 20 years, was of the opinion that the type of licensing violations alleged by Kmart were unlikely to lead to disciplinary proceedings, or any form of discipline more severe than a reprimand. (See Bus. & Prof. Code, § 1670.)

It was, in any event, within the discretion of the trial court to exclude evidence of the alleged violations because, as asserted by Heiner in opposition to Kmart's motion in limine, it was speculative and likely to lead to confusion and undue consumption of time on collateral issues. (Evid. Code, §§ 352, 702, 800.) Moreover, Dr. Gartrell described several ways in which Heiner easily could have brought his practice into compliance with all relevant statutory provisions had he been able to continue as a dentist, and Kmart made no offer of proof that would have rebutted this evidence. The standard for proving compliance with legal requirements to obtain recovery for future damages that depend upon such compliance is stated in *Rodriguez v. Kline* (1986) 186 Cal.App.3d 1145 [232 Cal.Rptr. 157]. In that case, the plaintiff was an undocumented alien who obtained a judgment awarding damages for injuries sustained in a traffic accident. (*Id.* at p. 1149.) On appeal, the defendant asserted that the plaintiff was not entitled to damages for lost future wages in the United States because, as the plaintiff candidly admitted, he was subject to deportation. The *Rodriguez* court held that it was the plaintiff's burden to show that he had undertaken steps to cure the problem such that he would be able to achieve compliance during the relevant time period. (*Ibid.*) In the present case, Kmart presented no evidence and made no offer of proof to show that the compliance strategy described by Dr. Gartrell would not have brought Heiner's practice into full compliance with the Business and Professions Code. In these circumstances, any error in the trial court's decision to exclude evidence of licensing violations was either waived or harmless.[4]

---

[4]Kmart also contends that the evidence of licensing violations was admissible to show misconduct amounting to "unclean hands." Unclean hands is of course a familiar equitable doctrine, available as a defense in some actions at law. (See *Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978-980 [90 Cal.Rptr.2d 743].) Assuming it is available to reduce a compensatory damage award in an action for personal injuries—a point we do not address—it has no application here. "The misconduct that brings the unclean hands doctrine into play must relate directly to the cause at issue. Past improper conduct or prior misconduct that only indirectly affects the problem before the court does not suffice. The determination of the unclean hands defense cannot be distorted into a proceeding to try the general morals of the parties." (*Id.* at p. 979; see *id.* at p. 984.) Here the alleged misconduct had nothing to do with Kmart or with the transaction at issue in the action. Thus the doctrine of unclean hands, if not categorically unavailable, was unsupported by the evidence of licensing violations.

2. *The Trial Court Did Not Abuse Its Discretion by Admitting Dr. Gartrell's Testimony About Future Profits Without a Timely and Specific Objection from Kmart.*

Kmart further contends that Dr. Gartrell's testimony about "future profits" should have been excluded because it was speculative. We conclude that Kmart waived this claim by agreeing to a lump-sum verdict on the issue of damages and by failing to object to Dr. Gartrell's testimony on the specific grounds asserted in this appeal. Moreover, contrary to Kmart's claim, Dr. Gartrell's testimony was not speculative. Rather, it was based on clear, well-founded, conservative assumptions about Heiner's rapidly growing dental practice, and Dr. Gartrell's extensive knowledge of the economics of dental practice. Thus, it was well within the discretion of the trial court to allow Dr. Gartrell to testify as he did. In addition, the jury obviously made an independent assessment of all the damages evidence—including the thorough cross-examination of Dr. Gartrell and the testimony of Kmart's own expert, Thomas Thomas—and awarded an amount substantially less than that projected by Dr. Gartrell for future profits alone. In these circumstances, we do not believe any error in the trial court's decision to admit Dr. Gartrell's testimony resulted in any significant prejudice to Kmart and certainly did not produce a miscarriage of justice. (See Evid. Code, § 353, subd. (b).)

In order to preserve this issue for appeal, it was incumbent upon Kmart to request a special verdict that would have segregated the elements of damages. (*Moore v. Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 746-747 [223 Cal.Rptr. 859].) Because Kmart failed to request a special verdict on the issue of damages, we have no way of determining what portion—if any—of the $3.8 million was awarded as compensation for future profits. Accordingly, any claim of error on this point may be deemed waived. (*Ibid.*; see also *English v. Lin* (1994) 26 Cal.App.4th 1358, 1369 [31 Cal.Rptr.2d 906]; *Enriquez v. Smyth* (1985) 173 Cal.App.3d 691, 700 [219 Cal.Rptr. 267].)

Kmart was also required to make a timely and specific objection to Dr. Gartrell's testimony. (Evid. Code, § 353, subd. (a); see also *Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 337-338 [145 Cal.Rptr. 47] (*Hyatt*).) A timely objection allows the trial court to exercise its sound discretion with respect to admissibility of expert testimony. (*County Sanitation Dist. v. Watson Land Co.* (1993) 17 Cal.App.4th 1268, 1277 [22 Cal.Rptr.2d 117].) Our review of this record discloses that, at all relevant times, Kmart acquiesced in the admission of Dr. Gartrell's testimony and, in particular, raised no objection to the charts by which the expert graphically presented his

projections of Heiner's likely future profits. For this reason as well, Kmart may be deemed to have waived its claim of error as to the admission of Heiner's lost profits evidence. (See *People v. Mattson* (1990) 50 Cal.3d 826, 853-854 [268 Cal.Rptr. 802, 789 P.2d 983].)

Even if Kmart had not waived its belated objection to Dr. Gartrell's testimony, the trial court did not abuse its discretion by admitting this evidence. As we have discussed, Dr. Gartrell was undisputedly qualified to serve as an expert on the economics of dental practice in this region. His opinions were based on reasonable projections from the actual history of Heiner's growing dental practice and evidence of the decline of that practice after Heiner was injured, as well as the expert's knowledge of business methods and financial trends in dental practice generally. In short, Dr. Gartrell provided well-founded, competent evidence from which a trier of fact could determine the profitability of a practice such as Heiner's. Kmart's attack on Dr. Gartrell's testimony is nothing more than a request that this court reweigh the expert testimony, draw inferences not drawn by the trial court, and substitute our judgment for that of the trial court. (*People v. Miller* (1994) 25 Cal.App.4th 913, 919 [31 Cal.Rptr.2d 423].) This we decline to do.

At bottom, the determination of damages is essentially a factual matter on which inevitable differences of opinion do not warrant intervention by the appellate courts. (*Niles v. City of San Rafael* (1974) 42 Cal.App.3d 230, 241 [116 Cal.Rptr. 733] (*Niles*).) Technical arguments about the meaning and effect of expert testimony on the issue of damages are best directed to the jury. (*Id.* at p. 243.) In this case, Kmart had ample opportunity to controvert Dr. Gartrell's testimony and to argue to the jury about the quality of his analysis and the weight to assign to the evidence. To the extent the jury decided to award Heiner damages for lost profits, that decision was based on substantial evidence and must not be disturbed by this court. (*Id.* at p. 242; see also *Wanland v. Los Gatos Lodge, Inc.* (1991) 230 Cal.App.3d 1507, 1518 [281 Cal.Rptr. 890]; *Rodriguez v. McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 656 [151 Cal.Rptr. 399]; *Connolly v. Pre-Mixed Concrete Co.* (1957) 49 Cal.2d 483, 489 [319 P.2d 343].)

Of course, we note that the *total* amount of compensatory damages awarded pursuant to the jury's verdict for medical expenses, past loss of ability to work, present value of lost future "earning capacity," pain and suffering, and emotional distress resulting from financial injury was not even half the amount Dr. Gartrell calculated as the present value of Heiner's lost profits. It was also almost $1 million less than the net lost income calculated

by Heiner's expert economist, Phillip Allman.[5] Moreover, apart from the evidence of projected lost profits, it was well within the province of the jury to award Heiner substantial damages for his loss of earning capacity and for the other elements of damage claimed at trial.[6] It seems quite likely that the jury disbelieved or rejected some or all of Dr. Gartrell's expert testimony about lost profits. In these circumstances, Kmart has failed to show that the claimed error in the admission of Dr. Gartrell's testimony resulted in any significant prejudice to Kmart, or in a miscarriage of justice, and reversal for any such error is therefore unwarranted. (Evid. Code, § 353, subd. (b); *Wanland v. Los Gatos Lodge, Inc., supra,* 230 Cal.App.3d at p. 1519.)

B. *Principles of Comparative Fault Do Not Require Apportionment of Damages to Reflect the Responsibility of a Victim of Battery for His Own Injuries.*

Kmart also challenges the trial court's refusal to apportion damages based on Heiner's "contributory negligence" with respect to the cause of action for battery. Kmart acknowledges that it did not specifically raise this objection until January 27, 1998, four days after the jury rendered its verdict and was discharged. Moreover, as we have noted, Kmart failed to request an instruction or verdict form embodying the present claim to apportionment, and failed to object to an instruction that specifically directed the jury that Heiner's negligence did *not* reduce Kmart's liability for battery.[7] Indeed, Kmart's trial counsel at one point specifically *agreed* that the jury should not apply comparative negligence principles to Kmart's liability for battery. Nevertheless, Kmart spends nine pages of its reply brief arguing that it did not waive this claim. We reject this argument. (See *Agarwal v. Johnson* (1979) 25 Cal.3d 932, 950-951 [160 Cal.Rptr. 141, 603 P.2d 58], disapproved on another point in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4 [88 Cal.Rptr.2d 19, 981 P.2d 944]; *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1065-1066 [232 Cal.Rptr. 528, 728 P.2d 1163]; *Mesecher v.*

---

[5]Allman compared the present value of Heiner's projected lifetime income as a dentist with his projected lifetime income from alternative employment, e.g., a career in business following acquisition of a master's degree in business administration. The difference between those two income streams was Heiner's net economic loss as a result of the injury.

[6]Damages may be awarded for lost earning capacity without *any* proof of actual loss of earnings. (See *Hilliard v. A.H. Robins Co.* (1983) 148 Cal.App.3d 374, 412-413 [196 Cal.Rptr. 117]; *Niles, supra,* 42 Cal.App.3d at pp. 241-242; *Connolly v. Pre-Mixed Concrete Co., supra,* 49 Cal.2d at p. 489.)

[7]Kmart claims it preserved this point for appeal by requesting a verdict form that lumped all of Heiner's causes of action together and asked the jury to apportion the responsibility for Heiner's injuries between Kmart's "negligence, fault, and wrongful conduct" on the one hand, and Heiner's "contributory negligence" on the other. Kmart makes no showing that it ever pressed for a ruling on this verdict form and ignores the fact that its counsel expressly agreed that damages for battery should not be apportioned based on comparative fault principles.

*County of San Diego* (1992) 9 Cal.App.4th 1677, 1685 [12 Cal.Rptr.2d 279]; *In re Marriage of Broderick* (1989) 209 Cal.App.3d 489, 501 [257 Cal.Rptr. 397]; *Hilts v. County of Solano* (1968) 265 Cal.App.2d 161, 171 [71 Cal.Rptr. 275]; *Hyatt, supra,* 79 Cal.App.3d at p. 335; *Gaspar v. Georgia Pac. Corp.* (1967) 248 Cal.App.2d 248, 251 [56 Cal.Rptr. 243]; *Pacific Tel. & Tel. Co. v. Monolith* (1965) 234 Cal.App.2d 352, 360-361 [44 Cal.Rptr. 410].)

In any event, it is reasonably clear that apportionment of fault for injuries inflicted in the course of an intentional tort—such as the battery in this case—would have been improper. The rule was stated in *Bartosh v. Banning* (1967) 251 Cal.App.2d 378 [59 Cal.Rptr. 382], as follows: "[A]ssault and battery are intentional torts. In the perpetration of such crimes negligence is not involved. As between the guilty aggressor and the person attacked the former may not shield himself behind the charge that his victim may have been guilty of contributory negligence, for such a plea is unavailable to him." (*Id.* at p. 385.)

Kmart contends that *Bartosh* is no longer good law in light of the adoption of a regime of "comparative fault" in *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 825 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] (*Li*), and *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, 608-609 [146 Cal.Rptr. 182, 578 P.2d 899] (*American Motorcycle*). The trial court disagreed, and so do we. As the court explained in *Allen v. Sundean* (1982) 137 Cal.App.3d 216 [186 Cal.Rptr. 863] (*Allen*), *Li* "used language which appears to exclude intentional torts from the comparative fault system." The *Allen* court further noted that *no authority* supports an extension of comparative fault principles to intentional torts. (*Allen, supra,* 137 Cal.App.3d at pp. 226-227; see also *Godfrey v. Steinpress* (1982) 128 Cal.App.3d 154, 176 [180 Cal.Rptr. 95] (*Godfrey*).)

Authors of a leading treatise agree that, despite the adoption of comparative negligence, liability for battery is not diminished by the victim's negligence: "Contributory negligence never has been considered a good defense to an intentional tort such as a battery, and it would likewise appear contrary to sound policy to reduce a plaintiff's damages under comparative fault for his 'negligence' in encountering the defendant's deliberately inflicted harm." (Prosser & Keaton on Torts (5th ed. 1984) § 67, pp. 477-478, fn. omitted; see also Dear & Zipperstein, *Comparative Fault and Intentional Torts: Doctrinal Barriers and Policy Considerations* (1984) 24 Santa Clara L.Rev. 1, 19-20.)

Citing *Baird v. Jones* (1993) 21 Cal.App.4th 684 [27 Cal.Rptr.2d 232] and various cases cited therein, Kmart suggests that a "modern trend" has

extended comparative negligence principles to all tort cases "irrespective of the basis for liability." (*Id.* at pp. 688-692; see also *Patrick v. Maryland Casualty Co.* (1990) 217 Cal.App.3d 1566 [267 Cal.Rptr. 24]; *Sorensen v. Allred* (1980) 112 Cal.App.3d 717 [169 Cal.Rptr. 441, 10 A.L.R.4th 937]; *Daly v. General Motors Corp.* (1978) 20 Cal.3d 725 [144 Cal.Rptr. 380, 575 P.2d 1162].) The cases on which Kmart relies do not support this claim. Indeed, *Baird, supra,* 21 Cal.App.4th at page 691, cites with approval the holdings of *Allen* and *Godfrey,* which along with *Li* and *American Motorcycle* constitute an unbroken line of authority barring apportionment where, as here, the defendant has committed an intentional tort and the injured plaintiff was merely negligent. With the overwhelming weight of authority supporting its decision, the trial court did not err in rejecting Kmart's belated claim for apportionment of damages from the battery found in this case.[8]

C. *The Trial Court Did Not Err by Instructing the Jury That Renehan Was, as a Matter of Law, Kmart's Agent.*

■ Kmart next contends that the trial court erred by instructing the jury that Renehan was, as a matter of law, Kmart's agent. It is clear from the undisputed evidence, however, that Renehan's use of force upon Heiner for the admitted purpose of detaining him to recover the spindle of refund slips was "engendered by" and "ar[o]se from" Renehan's work as a Kmart security guard. (*Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 298 [48 Cal.Rptr.2d 510, 907 P.2d 358].) Under the *Lisa M.* standard, no other conclusion could reasonably be drawn. (*Ibid.*; see also 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 136, pp. 132-134, and cases cited therein.) Kmart's claim that Renehan had no intent to injure Heiner does not support its argument on this issue; if anything it supports the finding of agency. (*Rodgers v. Kemper Construction Co.* (1975) 50 Cal.App.3d 608, 620-621 [124 Cal.Rptr. 143].)

D. *The Trial Court Did Not Abuse Its Discretion by Excluding Evidence of Heiner's Involvement in Other Physical and Verbal Altercations.*

In a one-page argument at the end of its opening brief, Kmart contends that the trial court erred by excluding evidence of Heiner's prior encounters with the police and with his ex-wife. As Kmart offers no legal authority to

---

[8]Kmart also claims that its liability for Renehan's battery should be apportioned because Renehan did not have an intent to harm Heiner, the security guard being guilty of, at most, "willful misconduct." However, Kmart did not seek a jury finding on the issue of Renehan's intent and did not raise this issue before the jury returned its verdict. Kmart has thus waived this claim. (See *Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 879 [242 Cal.Rptr. 184]; *Adelson v. Hertz Rent-A-Car* (1982) 133 Cal.App.3d 221, 226 [183 Cal.Rptr. 779].)

support this claim of error, we may reject it out of hand. (See 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594, pp. 627-629, and the numerous cases cited therein.) Furthermore, although Kmart acknowledges that a ruling pursuant to Evidence Code section 1101 is a matter entrusted to the sound discretion of trial court, it offers no cogent reason why we should find that the trial court abused its discretion when it decided to exclude the evidence of Heiner's prior conduct.[9] Thus, we decline to do so. (See Evid. Code, § 1101.)

### E. *Kmart Has Waived Its Claim of Instructional Error.*

For the first time in this litigation, Kmart argues *in its reply brief* that the trial court committed prejudicial error by "refusing" to instruct the jury with BAJI No. 14.60.[10] It appears that Kmart requested this instruction on the issue of speculative damages, but raised no objection when the trial court failed to read it to the jury. We will not spend any judicial resources resolving this untimely claim. It has been doubly waived. (*Williams v. City of Belvedere* (1999) 72 Cal.App.4th 84, 92, fn. 2 [84 Cal.Rptr.2d 658].)

### III.

### CONCLUSION

For all the foregoing reasons, the judgment of the trial court is affirmed in its entirety. Costs to respondent.

Hanlon, P. J., and Poché, J.,* concurred.

A petition for a rehearing was denied November 27, 2000, and appellant's petition for review by the Supreme Court was denied February 14, 2001.

---

[9]In relevant part, Evidence Code section 1101 provides: "[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Limited exceptions to this rule of inadmissibility are provided by Evidence Code sections 1102, 1103, 1108, and 1109, none of which apply to this case. We note, however, that the trial court limited its exclusionary ruling by saying that evidence of prior bad acts would be admissible for impeachment or to prove the extent and cause of Heiner's injuries.

[10]BAJI No. 14.60 provides: "You are not permitted to [award a party] [include] speculative damages, which means compensation for future loss or harm which, although possible, is conjectural or not reasonably certain. [¶] However, [if you determine that a party is entitled to recover,] you should compensate a party for loss or harm caused by the injury in question which is reasonably certain to be suffered in the future."

*Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.