Filed 6/5/24  Waud v. Dawson-Dixon CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| ERNEST P. WAUD III et al.,<br><br>  Plaintiffs and Respondents<br><br>  v.<br><br>MARILYN J. DAWSON-DIXON,<br><br>  Defendant and Appellant, | G063304<br><br>(Super. Ct. No. CVPS2100614)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Godofredo Magno, Judge.  Affirmed in part, reversed in part, and remanded.

Point Law Group and Troy M. Mueller for Defendant and Appellant.

Sauer & Wagner, Robert S. Chapman and Gregory P. Barchie for Plaintiffs and Respondents.

Respondents Ernest P. Waud III and Chase Steer are neighbors and friends who share an interest in show horses.  In 2019, Steer approached appellant Marilyn J.

Dawson-Dixon about purchasing a horse she owned named Peninsula Vertigo (Vertigo). Dawson-Dixon declined to sell the horse but agreed to lease it to Steer for one year. The deal was struck, and Waud paid the lease amount. Over the next few months, Dawson-Dixon offered Waud and Steer investment opportunities in two show horses, Buckle Up and Classic Lad (Classic), in which she claimed to hold investment interests, and another show horse, Quibelle, in which she told Waud she would buy an interest. Waud agreed to purchase an investment interest in each of the three horses.

Acting as Waud's agent and fiduciary, Dawson-Dixon paid $250,000 to purchase Buckle Up and then sold Waud a 50 percent interest in the horse for $350,000, plus a commission of $26,250. She later sold Waud her remaining 50 percent interest in Buckle Up for $400,000. Acting as Waud's agent and fiduciary, Dawson-Dixon purchased Classic for $66,000 and then sold Waud a 75 percent interest in the horse for $180,000. The transaction with Quibelle was a little different. Waud told Dawson-Dixon he did not want to purchase a 100 percent interest in Quibelle. So, acting as Waud's agent and fiduciary, Dawson-Dixon purchased all rights to Quibelle for $126,900 (which Waud paid), but told Waud he had acquired only 55 percent of Quibelle for that sum and she had acquired the remaining 45 percent.

The parties agreed Dawson-Dixon was responsible for providing care and training to all four horses and Steer and Waud were responsible for paying the expenses of the care and training. Over the next few years, Waud paid Dawson-Dixon more than $600,000 in care and training costs.

The parties ultimately had a falling out. Steer and Waud sued Dawson-Dixon, who in turn filed a cross-complaint against them. A jury found for Steer and Waud on all their claims but awarded damages only to Waud, who had made all the payments to Dawson-Dixon. The jury awarded Waud $900,000 in damages. The jury found against Dawson-Dixon on all her claims.

Dawson-Dixon appeals the judgment on several grounds. We conclude the trial court erred by refusing to permit Dawson-Dixon's horse valuation expert, who had COVID-19 and could not attend trial in person, to testify remotely. We therefore reverse for a limited trial on damages. We find no merit in the remainder of Dawson-Dixon's grounds for appeal, including her assertion that the damages awarded to Waud are not supported by substantial evidence.

FACTUAL HISTORY

In 2018, Steer contacted Dawson-Dixon to inquire about purchasing her horse, Vertigo. Dawson-Dixon did not want to sell Vertigo but agreed to lease the horse to Steer for one year for $120,000. Pursuant to the terms of the lease agreement, Vertigo would remain in Dawson-Dixon's care for training during the period of the lease, and Steer would reimburse Dawson-Dixon for the costs of the care and training. The lease was later renewed for another year on the same terms. Waud, a close friend and supporter of Steer's interest in show horses, paid all the lease fees and expenses for Vertigo.

Shortly after Steer leased Vertigo, Dawson-Dixon told him of a possible investment opportunity in Buckle Up. Dawson-Dixon told Steer she owned 50 percent of Buckle Up and a co-investor owned the other 50 percent. Steer relayed the information to Waud and, after speaking directly with Dawson-Dixon, Waud decided to purchase the 50 percent interest in Buckle Up that Dawson-Dixon said was owned by her co-investor. Dawson-Dixon told Waud the 50 percent interest would cost $350,000. In fact, Dawson-Dixon's representation that she owned 50 percent of Buckle Up was false; Dawson-Dixon owned only a 30 percent interest in Buckle Up. The other 70 percent was owned by Anne Marie Patmore.

Dawson-Dixon told Patmore someone wanted to purchase a 100 percent interest in Buckle Up for $250,000 and assured Patmore the $250,000 offer was a "very fair" price. Patmore agreed to sell her 70 percent share in Buckle Up for 70 percent of the $250,000 purchase price—i.e., $175,000.

3

In addition to charging Waud $350,000 for a 50 percent interest in Buckle Up, Dawson-Dixon charged him a commission of $26,250 and $20,000 in expenses. Waud paid all three amounts.[1] After completing the sale, Dawson-Dixon assumed responsibility for Buckle Up's care and training and billed Steer and Waud for the expenses she claimed to incur; Waud paid the bills.

Following the Buckle Up transaction, Dawson-Dixon approached Steer and Waud about investing in another horse, Classic. She said they could buy 75 percent of Classic for $180,000 and she would own the other 25 percent. Waud agreed to the purchase and Dawson-Dixon arranged to buy Classic. Despite her representation to Waud and Steer that the purchase price was $180,000, she bought 100 percent of Classic for only 60,000 euros—the equivalent of $66,000. On May 9, 2019, Waud transferred $182,549 to Dawson-Dixon for his purchase of a 75 percent ownership interest in Classic.

Dawson-Dixon then offered to sell her half of Buckle Up to Waud for $400,000. Waud accepted her offer. They agreed Waud would pay Dawson-Dixon $350,000 in cash and the remainder via a $50,000 credit by transferring a 25 percent interest in Classic to Dawson-Dixon. Including the $396,250 Waud paid for his initial 50 percent interest in Buckle Up, the $350,000 cash he paid for the remaining 50 percent, and the $50,000 credit he received for transferring a portion of his interest in Classic, Waud paid Dawson-Dixon a total of $796,250 to acquire a 100 percent interest in Buckle Up.

In the fall of 2019, Steer traveled with Dawson-Dixon to look at more horses for possible investment by Waud. Steer decided on a mare named Quibelle. Waud

---

[1] After completing the sale of Buckle Up to Waud, Dawson-Dixon sent Patmore $175,000, which was only 70 percent of the claimed total sale price of $250,000 for the horse. She never told Patmore that the buyer, Waud, had paid $350,000 for only a 50 percent interest in Buckle Up.

4

agreed to purchase an interest in Quibelle but told Dawson-Dixon he did not want a 100 percent interest. Dawson-Dixon proposed that Waud buy only a 55 percent interest for $126,900 and she would purchase the other 45 percent. Waud agreed and paid Dawson-Dixon the $126,900, along with a 15 percent commission ($19,487) on the transaction. As with the other horses, Quibelle remained under Dawson-Dixon's care following the purchase, with Waud paying Dawson-Dixon for all the expenses of the mare's care and training. In fact, Dawson-Dixon used Waud's $126,900 to purchase 100 percent of Quibelle, and though she contributed nothing to the purchase price, she continued to claim she owned a 45 percent interest in the horse. Ultimately, Quibelle was bred with Vertigo, and three embryos resulting from that breeding (Foals) were implanted in host mares. Thereafter, Quibelle died following an unsuccessful surgery.

On June 24, 2019, at Dawson-Dixon's request, Waud paid Dawson-Dixon $100,000 in expenses related to the care and upkeep of the horses. Dawson-Dixon did not provide any backup documentation for the requested expenses. Later in 2019, Dawson-Dixon asked Waud to pay her a management fee of $10,000 per month to care for and oversee the investment horses. Waud agreed, and in August 2019, Waud paid Dawson-Dixon $120,000 for a year's worth of management fees. Dawson-Dixon later informed Waud she considered the $120,000 in fees to be retroactive. Over the period of their dealings, Waud paid Dawson-Dixon more than $659,000 in management fees and expenses.

At some point, the parties quarreled for reasons unrelated to this appeal, and Waud and Steer filed a complaint against Dawson-Dixon for fraud, breach of fiduciary duty, and breach of contract arising out of the purchase and care of the horses. They also sought equitable relief: Waud and Steer sought partition of the ownership interests in Vertigo, Classic, and the Foals and an accounting of the expenses paid to Dawson-Dixon. Dawson-Dixon responded with a cross-complaint. She asserted two breach of contract claims—a first cause of action against Waud for failing to pay her

5

$120,000 management fee for 2020 and her management fees and expenses for 2021 and 2022, and a second cause of action against both Waud and Steer, based on a claimed promise by Steer to pay her 2020 management fees if she came to California. She also asserted a fraud claim against Steer relating to his alleged attempt to obtain ownership of Vertigo. Dawson-Dixon also brought a claim for declaratory relief regarding her ownership interest in Vertigo under Canadian law.[2]

The non-equitable claims of both parties proceeded to a jury trial, and the jury found against Dawson-Dixon on her claims. It found in favor of Waud on his claims against Dawson-Dixon for fraud, breach of fiduciary duty, and breach of contract and found Dawson-Dixon acted with malice, fraud, or oppression on the fraud and breach of fiduciary duty claims. The jury found against Dawson-Dixon on Steer's claim for breach of fiduciary duty, and also found Dawson-Dixon acted with malice, fraud, or oppression on that claim. It found in Dawson-Dixon's favor on only one claim: Steer's claim against her for breach of contract. The jury awarded $900,000 in damages to Waud and no damages to Steer.

Following a second phase of trial on punitive damages, the jury awarded no punitive damages to Waud.[3] The trial court later granted Dawson-Dixon's motion for judgment notwithstanding the verdict against her on Steer's breach of fiduciary duty claim based on the jury's finding that Steer had suffered no damages. The court ordered judgment to be entered in Dawson-Dixon's favor on that claim.

The parties' respective equitable claims were considered by the trial court based on the same evidence presented to the jury on the non-equitable claims and were

---

[2] At trial, the operative pleadings were the second amended complaint by Waud and Steer and Dawson-Dixon's first amended cross-complaint. For convenience, we refer to the pleadings as the complaint and cross-complaint, respectively.

[3] The issue of punitive damages on Steer's breach of fiduciary claim was not put before the jury, presumably because the jury had found Steer suffered no damages.

addressed in the court's final judgment on the complaint and cross-complaint. On the two partition causes of action asserted in the complaint, the court found (1) Waud and Dawson-Dixon each own a 50 percent interest in Classic, (2) Waud owned a 100 percent interest in Quibelle from the time the horse was first purchased until its death, (3) Dawson-Dixon holds a 100 percent interest in Vertigo, and (4) Waud and Dawson-Dixon each hold a 50 percent interest in the three Foals. The court found Waud and Steer's request for an accounting of the amounts paid for the various horses was moot because "the parties presented evidence through retained accounting experts and the damages awarded by the jury reflects that defendant Dixon owes $900,000 to plaintiff Waud."

As for Dawson-Dixon's seventh cause of action against Waud for declaratory relief regarding ownership of Vertigo, the trial court found there was no existing controversy because Waud had never asserted any ownership interest in Vertigo. Accordingly, the court entered judgment in Waud's favor on that claim. On Dawson-Dixon's seventh cause of action for a declaration that Steer did not hold an ownership interest in Vertigo "under Canadian law," the court entered judgment for Steer because no evidence was presented at trial concerning Canadian law. The court explained that under California law, expert witness testimony is required to introduce evidence concerning application of foreign law in an action pending in California. However, Dawson-Dixon did not designate before trial an expert to testify concerning Canadian law, and the court therefore had entered an order in limine precluding her from introducing evidence on Canadian law at trial.

Judgment was entered in accordance with the foregoing. Dawson-Dixon appeals the judgment on seven grounds: (1) the damages awarded to Waud were not supported by substantial evidence; (2) the trial court erred by not allowing Dawson-Dixon's valuation expert to testify remotely; (3) the court erred by refusing to offset Waud's damages by a $130,000 insurance payment Waud received as a result of Quibelle's death; (4) the judgment should be reversed because the trial exhibits were lost

7

after trial; (5) the judgment should be reversed because of an error on the jury verdict form; (6) the judgment should be reversed and a new judgment entered in Dawson-Dixon's favor on Waud and Steer's second cause of action for partition; and (7) judgment should be entered for Dawson-Dixon on her seventh cause of action for declaratory relief under Canadian law. We find the court erred only by refusing to allow Dawson-Dixon's valuation expert to testify remotely at trial.

DISCUSSION

I.

SUBSTANTIAL EVIDENCE SUPPORTS THE DAMAGES AWARD

Dawson-Dixon argues the judgment should be reversed because the $900,000 damages award was not supported by substantial evidence. She contends the jury awarded two forms of damages: (1) damages related to the purchases of the horses and (2) damages related to the expenses Waud paid her to care for and train the horses. She argues the first category of damages was not supported by substantial evidence because Waud's expert was not qualified to assess the value of what Waud received in each purchase. She argues the second category was not supported by substantial evidence because Waud's expert was unable to definitively establish the amount of the overpayment. Neither argument is persuasive.

"To preserve for appeal a challenge to separate components of a plaintiff's damage award, a defendant must request a special verdict form that segregates the elements of damages. [Citations.] The reason for this rule is simple. Without a special verdict separating the various damage components, 'we have no way of determining what portion—if any' of an award was attributable to a particular category of damages challenged on appeal." (*Greer v. Buzgheia* (2006) 141 Cal.App.4th 1150, 1158; see *Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 346 [to preserve the issue of any separate element of damages for appeal, the appellant must "request a special verdict that would have segregated the elements of damages"; otherwise, the issue is forfeited].)

8

Here, the jury was not given a special verdict form that segregated the various elements of damages claimed or awarded; by agreement of the parties, the jury was asked only to render a general verdict with special findings. And though the verdict form asked the jury to separately indicate whether it found in favor of Waud on his claims against Dawson-Dixon for fraud, breach of fiduciary duty, and breach of contract (findings 1, 2, and 3), it only asked the jury to award Waud a single, undifferentiated amount of damages on all of the claims. In finding 6, the jury found simply: "We, the jury, award damages in favor of plaintiff Ernest Waud, and against defendant Marilyn J. Dawson-Dixon, as follows: $900,000." Because the jury was not asked to—and did not—assign or allocate the damages awarded to each category of damages sought, it is impossible for us to determine what amount was awarded for each category. By failing to request a special verdict form segregating the elements of damages, Dawson-Dixon failed to preserve her challenge to the amount of damages awarded.

Dawson-Dixon, however, argues that *none* of the damages in *any* of the categories sought by Waud is supported by substantial evidence. We therefore address Dawson-Dixon's claim that substantial evidence does not support any award of damages in any amount.

*A. Waud Presented Substantial Evidence to Support an Award of Damages Related to the Purchases of the Horses*

Dawson-Dixon argues Waud cannot recover any damages related to his purchases of the horses because he failed to present evidence of the "actual value" of the horses. The jury found for Waud on his fraud, breach of fiduciary, and breach of contract claims. Contract damages are governed by Civil Code section 3300, which allows a party to recover "for all the detriment proximately caused" or "which . . . would be likely to result therefrom." (*Ibid*.) Damages relating to fraud in the purchase, sale, or exchange of property are governed by Civil Code section 3343, subdivision (a), which allows a party to recover "the difference between the actual value of that with which the defrauded

9

person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction." (*Ibid.*) Damages for breach of fiduciary duty are governed by Civil Code section 3333, which allows recovery of "the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (*Ibid.*)[4]

Waud presented evidence of his damages through his designated expert, Neil Beaton, a forensic accountant.[5] Beaton calculated Waud's damages from the purchases of Buckle Up, Classic, and Quibelle by analyzing the evidence on each transaction, beginning with the fair market value. "[T]he proper and generally accepted method of establishing actual value is by evidence of market value . . . ." (*Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744, 754.) "Reasonable market value, or fair market value, is the price that '"a willing buyer would pay to a willing seller, neither being under compulsion to buy or sell, and both having full knowledge of all pertinent facts."'" (*Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1274.)

Beaton determined Buckle Up had a fair market value of $250,000 by relying on testimony from Patmore, the 70 percent owner of Buckle Up, that Dawson-Dixon told her that $250,000 was a "very fair" price for the horse. Evidence showed

---

[4] The parties argue about what measure of damages applies to Waud's fraud claim—benefit of the bargain or out-of-pocket. The argument is academic, however, because Dawson-Dixon's argument is that Waud failed to present evidence of the value Waud received, which is required under either measure. (CACI Nos. 1923 & 1924). Further, the damages were not segregated by claim.

[5] Although Dawson-Dixon contends Beaton was not "qualified" to appraise the value of the horses, the record shows he did not do so. Rather, he relied on other evidence in the record regarding the actual sale prices (or, for Buckle Up, Dawson-Dixon's admission that $250,000 was a "fair price" for the horse) as proof of the fair market value for each animal, and he then performed his damages calculations based on those fair market values. As discussed below, Beaton's reliance on actual sale prices as evidence of fair market value does not show Beaton was unqualified to perform his damages calculations.

Waud paid a total of $726,250 (including Dawson-Dixon's $26,250 commission) for a 100 percent interest in Buckle Up. Beaton subtracted Buckle Up's fair market value ($250,000) from the price Waud paid ($726,250) to arrive at damages of $476,250 in connection with Waud's purchase of Buckle Up.

Beaton determined Classic's fair market value was $66,000 based on evidence showing Dixon purchased Classic for about $66,000. Because Waud paid $180,000 for Classic, Beaton found Waud was damaged by overpaying approximately $114,000 ($180,000 - $66,000) for the horse.

For damages resulting from the purchase of Quibelle, Beaton relied on evidence Waud paid $126,900 on the understanding and condition he was purchasing only a partial interest in the horse. Because Waud did not want to buy a 100 percent interest in Quibelle, Beaton opined Waud was damaged by the purchase in the sum of $126,900—the entire purchase amount.

Using the fair market values Beaton derived from the evidence in the case, the evidence supported a finding Waud was damaged in the amount of $717,150 ($476,250 + $114,000 + $126,900) in connection with the purchase of the horses.

B. *Waud Presented Substantial Evidence to Support an Award of Damages Related to Overpaid Expenses*

In analyzing the amount of Waud's damages related to overpayments of expenses, Beaton began with evidence that Waud paid Dawson-Dixon a total of $659,000 for the training and care of the horses. He testified, however, Dawson-Dixon's records in support of the claimed expenses were so "messy" and disorganized that a precise accounting of the expenses actually incurred could not be performed. Beaton testified only $138,000 could be traced to amounts actually expended in connection with Vertigo, Buckle Up, Classic, or Quibelle, resulting in an overpayment of about $521,000.

"Generally, 'the law tolerates more uncertainty with respect to damages than to the existence of liability. "Uncertainty of the *fact* whether any damages were

11

sustained is fatal to recovery, but uncertainty as to the *amount* is not.'" [Citation.] '[W]here the *fact* of damage has been established, the precise *amount* of the damage need not be calculated with absolute certainty. "As long as there is available a satisfactory method for obtaining a reasonably proximate estimation of the damages, the defendant whose wrongful act gave rise to the injury will not be heard to complain that the amount thereof cannot be determined with mathematical precision."'" (*Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 371.)

Because Dawson-Dixon's failure to maintain accurate and adequate records created any uncertainty in the precise amount by which Waud was damaged, she cannot now complain he did not prove the amount of his damages with precision. Beaton testified $521,000 in expenses paid by Waud could not be traced to Vertigo, Buckle Up, Classic, or Quibelle. Thus, there was substantial evidence to support an award of damages in that amount for overpaid expenses.

In sum, between the damages for the purchase prices of the horses and the damages for the overstated expenses, the jury had before it evidence that Waud sustained damages of $1,238,150. That is substantial evidence to support the $900,000 jury award.

II.

## THE COURT ERRED BY REFUSING TO ALLOW DAWSON-DIXON'S VALUATION EXPERT TO TESTIFY REMOTELY

Dawson-Dixon argues the trial court erred by denying her request to have her equine appraisal expert, Dianne Grod, testify remotely at trial. Grod flew from Florida to California to testify at trial in person, but after arriving in California, she tested positive for COVID-19. Because Grod was unable to appear at trial in person, counsel for Dawson-Dixon asked the court on the record "that she be permitted to appear remotely." Although the court found Grod was "unavailable, as she has fallen ill"—and although it had permitted two other witnesses to testify remotely for medical reasons,

12

including Waud and Robert Boswell, one of Dawson-Dixon's experts—the court denied the request as to Grod.[6]

On appeal, the parties quibble over whether Dawson-Dixon only offered to make Grod available to testify "by telephone" versus by some remote platform that would include both audio and video. When the issue was discussed on the record, the trial court did not recall any request for a "specific way of" having Grod testify; it recalled only a request for remote testimony. And as noted, the record reflects at least a verbal request by Dawson-Dixon's counsel that Grod testify "remotely." Ultimately, however, it is immaterial to our analysis if the court denied "telephone" or other "remote" testimony, because (1) the court made clear it was rejecting *any* form of remote appearance and requiring Grod to appear at trial "in person," and (2) it was error in either event.

The trial court explained it denied the request for Grod to testify remotely based on the right of confrontation: "I do believe based on due process, confrontation, even though I know it's mitigated in civil, I wanted Ms. Grod to be testifying in person."[7] The right of confrontation is a protection offered defendants in criminal proceedings

---

[6] The trial court suggested it permitted the other two witnesses to testify remotely because the parties had so stipulated. The record is to the contrary. The court allowed Boswell to testify remotely *despite* Waud's objection that the doctor's note provided by Boswell was a standard "check[] the box" form that "[was] not particularized to this witness or his condition." The record on appeal does not indicate whether the parties stipulated Waud could testify remotely.

[7] Later, in a hearing on Dawson-Dixon's motion for new trial, the trial court elaborated on the reason for its ruling "to give some more further background to kind of, I suppose, give the appellate courts my thinking, my reasoning, as to why I denied . . . Ms. Dawson-Dixon's request for Ms. Grod to appear remotely." The court explained: "I just want to give a history of my feeling regarding remote appearances as opposed to in-person appearances, the more material, the more significant the testimony is to the case, the more core to the subject, I wanted the jury, and obviously the parties to be able to confront, exercise the due process in challenging the credibility of the testimony, and I wanted the jury to be able to see the witness in person."

under the Sixth Amendment to the United States Constitution. It applies only to criminal proceedings. (*San Diego Police Dept. v. Geoffrey S.* (2022) 86 Cal.App.5th 550, 562.) This was not a criminal proceeding and Waud had no right of confrontation under the Sixth Amendment. (U.S. Const., 6th Amend.) A limited right to confrontation and cross-examination, under the Fifth and the Fourteenth Amendments to the federal Constitution, applies in civil matters where there is a "'threat to life, liberty or property.'" (*Cahill Construction Co., Inc. v. Superior Court* (2021) 66 Cal.App.5th 777, 789.) In civil proceedings, however, the right to confrontation/cross-examination does not mandate any particular procedure; it requires only that the procedure adopted satisfy "'"""fundamental principles of fairness and decency."'"""" (*Ibid.*) Two other witnesses, including Waud, were allowed to testify remotely for medical reasons. Allowing Grod to also testify remotely would have satisfied fundamental principles of fairness and decency.

Further, this case was tried in June and July 2022 and was governed by Code of Civil Procedure section 367.75, subdivision (a), which was in effect between January 1, 2022, and June 29, 2023.[8] That statute allowed parties and witnesses to appear and testify remotely so long as notice was provided. (*Ibid.*) It "effectively establishe[d] a *presumption in favor of remote proceedings*, including remote trial testimony, until July 2023." (*Rycz v. Superior Court* (2022) 81 Cal.App.5th 824, 840, italics added.) Code of Civil Procedure section 367.75, subdivision (b) lists six bases that could rebut the presumption in favor of remote testimony. Five of the bases relate to technological difficulties and are not relevant to this appeal. The remaining basis, set forth in subdivision (3), allows the court to determine an in-person appearance would "materially assist in the determination" of the matter or the "effective management or resolution" of the case. (*Id.*, subd. (b)(3).) That basis, however, does not apply to expert witnesses:

---

[8] Code of Civil Procedure section 367.75 was amended, effective June 30, 2023. (Stats. 2023, ch. 34, § 3 (Sen. Bill No. 133).)

14

"Notwithstanding paragraph (3) of subdivision (b), an expert witness may appear remotely absent good cause to compel in-person testimony."[9] (*Id.*, subd. (c).)

Under Code of Civil Procedure section 367.75, Grod should have been allowed to testify remotely "absent good cause to compel in-person testimony." (*Id.*, subd. (c).) The record shows no good cause to deny a remote appearance. Grod was ill with COVID-19 and could not safely appear in person. Allowing her to testify remotely would not have given an advantage to either side; both sides would have been required to examine her remotely. The jury had already heard from two witnesses, including Waud and another expert, by remote means. Nothing in the record suggests there was anything about the subject matter of Grod's proffered testimony regarding the valuation of the horses that made it not amenable to remote testimony.

We conclude the trial court erred by not allowing Grod to testify remotely. Although Dawson-Dixon does not articulate in her briefing how she was prejudiced by the court excluding her valuation expert, the prejudice is manifest. Without Grod's testimony, Dawson-Dixon was denied the opportunity to present competing evidence of the actual value of the horses, which was a key element of Waud's damages claims. Although Dawson-Dixon was able to cross-examine Waud's damages expert on his

---

[9] Waud argues Dawson-Dixon failed to comply with California Rules of Court, rule 3.672(h)(2)(C)(i), which requires 10 days' notice for a remote appearance. Ten days' notice would have been impossible, however, because Grod obviously did not have 10 days' notice that she would contract COVID-19. Grod told counsel of her diagnosis shortly before she was scheduled to testify, and counsel promptly requested Grod be allowed to testify remotely. Further, rule 3.672(j)(2) allows a party to seek leave for a witness to appear remotely without notice: "Notwithstanding the other provisions of this rule, a party may ask the court for leave to appear remotely without the notice provided for under (f)–(h). The court may permit the party to appear remotely upon a finding of good cause, unforeseen circumstances, or that the remote appearance would promote access to justice." (Cal. Rules of Court, rule 3.672(j)(2).) Grod's illness was, at the very least, an unforeseen circumstance.

calculations and assumptions, that is no substitute for being able to present her own expert to affirmatively opine on the value of the horses.

## III.

### THE TRIAL COURT DID NOT ERR BY REFUSING AN OFFSET FOR THE INSURANCE PROCEEDS WAUD RECEIVED

Quibelle died in January 2021. Waud received an insurance payment of $130,000 for Quibelle's death, and Waud made a motion in limine to exclude evidence of the insurance payment. The trial court granted the motion under Evidence Code section 352. Although it precluded the jury from receiving any evidence of the insurance payment, the court reserved the issue for itself, stating it could apply the insurance proceeds as an equitable offset after trial, if appropriate.

Following trial, the trial court received supplemental briefing on whether the $130,000 insurance payment should be offset against Waud's $900,000 damages award. Waud argued against the offset on the ground that his claims relating to Quibelle were tort claims, and an offset for the insurance proceeds therefore was barred by the collateral source rule. Dixon argued the $130,000 should be offset against Waud's damages because the claims relating to Quibelle were contract claims. The record submitted by the parties does not include either a transcript of the hearing at which the offset was addressed or any order regarding the offset. The final judgment does not specifically reflect or reference the court's ruling on the offset issue, but the parties agree the court denied Dixon's request for an offset and the record supports that understanding.

On appeal, Dixon argues the trial court erred by denying the offset because the "damages claimed related to Quibelle sound in breach of contract." Her argument rests on two assumptions: (1) that some portion of the $900,000 in damages awarded to Waud related to his purchase of Quibelle and (2) that the portion theoretically attributable to Quibelle was awarded only on Waud's breach of contract claim. But those assumptions ignore the verdict rendered by the jury. As noted above, because of the

16

format of the verdict form, the jury awarded Waud a lump sum of $900,000 without segregating the award by claim, transaction, or any element of damages. We therefore have no way to discern what portion of that $900,000, if any, was attributable to Quibelle and, if so, based on what claim.

"""""Error is never presumed""""" (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 639.) "We presume the superior court's order is correct, and the appellant must affirmatively show error." (*Billauer v. Escobar-Eck* (2023) 88 Cal.App.5th 953, 969.) "Failure to provide an adequate record concerning an issue challenged on appeal requires that the issue be resolved against the appellants." (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 366.)

Dawson-Dixon did not meet her burden to show the trial court erred by refusing to offset the $130,000 against Waud's damages award.

IV.

THE TRIAL COURT DID NOT ERR BY DENYING DAWSON-DIXON'S REQUEST FOR DECLARATORY RELIEF UNDER CANADIAN LAW

Both Steer and Dawson-Dixon asked the trial court to determine ownership of Vertigo. Their claims, however, were asserted under different law. Steer's second cause of action against Dawson-Dixon for partition asked the court to determine each party's ownership interest in Vertigo, and because his complaint did not invoke the law of any foreign state or country, his claim was made under California law. (*Chen v. Los Angeles Truck Centers, LLC* (2019) 7 Cal.5th 862, 867 [California applies its own law "'unless a party litigant timely invokes the law of a foreign state'"]; see *Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 581 [even if the case involves foreign elements, the court normally applies California law].) In contrast, Dawson-Dixon's seventh cause of

17

action against Waud specifically sought a declaration she is the owner of Vertigo under Canadian law.

On Steer's California claim, the trial court found Dawson-Dixon "holds a 100 [percent] ownership interest in Vertigo."[10] On Dawson-Dixon's declaratory relief claim against Waud under Canadian law, the court found against Dawson-Dixon, ruling she had not presented evidence of Canadian law and therefore was not entitled to a declaration that she owned Vertigo under Canadian law. Dawson-Dixon argues the two verdicts are inconsistent and she should have been found to be the prevailing party on her seventh cause of action. We disagree.

The trial court did not rule on Steer's partition claim that Dawson-Dixon *was* the owner of Vertigo and on Dawson-Dixon's declaratory judgment claim that she *was not* the owner of Vertigo. That would have been inconsistent. The court simply denied Dawson-Dixon's claim for a declaration that she was the owner of Vertigo *under Canadian law*.

Dawson-Dixon now argues her declaratory relief claim was not really brought under Canadian law. The allegations of her cross-complaint show otherwise. Her cross-complaint alleges "Canadian law controls the ownership of Vertigo," recites requirements of "Alberta law," and seeks a declaration "under Canadian law" that Steer has no ownership interest in Vertigo. Dawson-Dixon's pleading leaves no doubt she sought declaratory relief regarding the ownership of Vertigo under Canadian law.

A party invoking foreign law has the burden to identify and explain the applicable foreign law. (*Frontier Oil Corp. v. RLI Ins. Co.* (2007) 153 Cal.App.4th 1436, 1465.) Although a court may take judicial notice of "[t]he law of . . . foreign nations," (Evid. Code, § 452, subd. (f)) it can only do so if the party asks it to do so and "[f]urnishes the court with sufficient information to enable it to take judicial notice of the

---

[10] No party challenges this finding.

matter" (Evid. Code, § 453(b)).  Dawson-Dixon did neither.  She therefore failed to provide the trial court with the necessary information to apply Canadian law as her seventh cause of action requested.  Because she did not meet her burden on her claim for declaratory relief, the court did not err in finding Waud prevailed on the claim.

Dawson-Dixon argues she nevertheless should have been found to be the prevailing party on her declaratory relief claim because, after the trial court precluded her from introducing evidence of Canadian law for failing to designate an expert on the subject, her counsel offered to submit California jury instructions on the claim.  But Dawson-Dixon did not amend, or even seek leave to amend, her seventh cause of action.  "The pleadings establish the scope of an action and, absent an amendment to the pleadings, parties cannot introduce evidence about issues outside the pleadings." (*Emerald Bay Community Assn. v. Golden Eagle Ins. Corp.* (2005) 130 Cal.App.4th 1078, 1091.)  Given Dawson-Dixon's failure to amend her seventh cause of action to seek a declaration under California law and her failure to provide expert testimony regarding Canadian law, Dawson-Dixon was not the prevailing party on her seventh cause of action.

V.

THE TRIAL COURT DID NOT ERR BY RULING ON WAUD'S PARTITION CLAIM

Dawson-Dixon argues the trial court erred by ruling on Waud's first cause of action for partition because she waived any ownership interest in Quibelle prior to trial.  The problem with this argument is that Waud's first cause of action for partition did not seek partition *with respect to Quibelle*.  It sought partition of ownership interests in Quibelle's Foals.  Both Waud and Dawson-Dixon claimed an interest in the Foals.[11]  To

---

[11]  The first cause of action also sought partition as to Classic:  "Waud requests that the Court determine the interests of each party in [Classic] and the Foals, order that possession of [Classic] be turned over to Waud to maintain the health and safety of that horse, and determine whether or not partition is appropriate, either by sale or transfer of interests, in [Classic] and the Foals."

19

decide Waud's claim for partition of the Foals, the trial court had to determine the ancillary matter of Quibelle's ownership, but there was no request for partition as to Quibelle (who was, by then, deceased). The trial court found Waud and Dawson-Dixon each owned a 50 percent interest in the Foals. (No party challenges this ruling.) Waud's first cause of action requested partition of the Foals. His request was granted, and he is the prevailing party on that claim.

Further, Dawson-Dixon's eleventh-hour "waiver" of any interest in Quibelle does not compel a different conclusion. She waived her interest in Quibelle on May 23, 2022—only about a month before trial began. Prior to that time, Dawson-Dixon repeatedly claimed she owned a 45 percent interest in Quibelle, including in statements made under penalty of perjury. Dawson-Dixon has shown no error in the trial court's judgment on Waud's first cause of action.

VI.

DAWSON-DIXON FAILED TO SHOW PREJUDICIAL ERROR IN CONNECTION WITH THE ALLEGEDLY LOST TRIAL EXHIBITS OR THE VERDICT FORM

Dawson-Dixon argues the judgment should be reversed because the trial court lost the exhibits that were admitted into evidence at trial. The record is unclear as to when the exhibits were lost, but Dawson-Dixon does not argue—much less point to anything in the record showing—they were lost before the matter was submitted to the jury. The record shows that in October 2022, months after the conclusion of the trial, the parties were asked to and did provide the trial court with copies of "all the exhibits admitted into evidence at trial and submitted to the jury." Thus, Dawson-Dixon had a complete copy of the exhibits admitted at trial before she filed this appeal.

Dawson-Dixon claims she was prejudiced by the loss of the original set of trial exhibits because she was precluded from examining "the trial exhibits submitted to the jury and, if incomplete, challenging on this appeal the completeness of the record presented to the jury at the time of deliberation . . . ." In support of her claim of

20

prejudice and request for reversal, Dawson-Dixon cites *In re Roderick S.* (1981) 125 Cal.App.3d 48 and *People v. Gibson* (2015) 239 Cal.App.4th 1151.  Neither case supports her argument.

In *In re Roderick S.*, a juvenile was adjudged a ward of the court for carrying a switchblade knife.  Although testimony was given at trial that the knife was not a switchblade, the record showed the trial court examined the knife itself and determined it was a switchblade.  The knife was destroyed while the case was on appeal, however, so the reviewing court was "unable to ascertain whether the judge's view of the knife was in fact substantial evidence supporting the trial court's finding."  (*In re Roderick S., supra,* 125 Cal.App.3d at p. 53.)  Unlike the destroyed knife in *In re Roderick*, the missing original set of trial exhibits here could be—and readily was—recreated by the parties and are before us on this appeal.  No physical evidence was lost or destroyed here.

*People v. Gibson* actually undercuts Dawson-Dixon's argument.  In that case, the trial court failed to retain two exhibits from the trial.  The reviewing court found the error harmless because it was able to obtain a certified copy of the documents and review them on appeal.  (*People v. Gibson, supra,* 239 Cal.App.4th at p. 1157.)  Similarly, here, the set of exhibits admitted at trial was later recreated by the parties, submitted to the trial court, and made available both to Dawson-Dixon and this court in connection with this appeal.

On appeal, a judgment is presumed correct.  (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.)  The appellant has the burden to "affirmatively to show error and to show further that the error is prejudicial."  (*Vaughn v. Jonas* (1948) 31 Cal.2d 586, 601; see Cal. Const., art. VI, § 13 [error must result in "miscarriage of justice" to warrant reversal].)  Dawson-Dixon has not shown prejudicial error in connection with the loss of the original trial exhibits.

Dawson-Dixon also argues the judgment should be reversed because the verdict form submitted to the jury contained an error with respect to her breach of contract claims. We do not agree.

Dawson-Dixon alleged two breach of contract claims in her cross-complaint. Her first cause of action for breach of contract was alleged only against Waud for failure to pay her 2020 management fees and her management fees and expenses for 2021 and 2022. Her second breach of contract cause of action, asserted against both Waud and Steer, alleged Steer promised to pay her 2020 management fees if she went to Thermal, California with the horses in December 2020 but failed to pay after she did so.

Prior to trial, the parties submitted a proposed general verdict form that contained 17 findings. Findings 11 and 12 of that initial proposed form addressed Dawson-Dixon's breach of contract claims. Finding 11 asked the jury if it found in favor of Dawson-Dixon on her claim of breach of contract as against Waud. Finding 12 asked the jury if it found in favor of Dawson-Dixon on her claim of breach of contract as against Steer. That form, however, was not the one that went to the jury. In the verdict form ultimately provided to the jury, Dawson-Dixon's breach of contract claims were addressed in findings 10 and 11. Finding 10 asked if the jury found in favor of Dawson-Dixon on her breach of contract claim against Waud. Finding 11 asked the jury if it found in favor of Dawson-Dixon on her breach of contract claim against Waud and Steer.[12]

Dawson-Dixon's theory of error on the verdict form is that, because the jury found against her on her breach of contract claim against Waud (finding 10), and the verdict form addressed her breach of contract claim against both Waud and Steer in a single finding (finding 11), it is possible the jury "simply applied their finding as to Mr. Waud to conclude that both [Steer and Waud] could not be found liable as stated" in

_____

[12] The two forms were different in other respects not relevant to this argument.

22

finding 11. But Dawson-Dixon did not pursue her breach of contract claim against Steer at trial. In her closing argument, she only briefly mentioned any of the claims in her cross-complaint, and she never referenced Steer or his purported promise to pay her the fees if she came to California. Thus, even if we could find it was error to include both Steer and Waud in finding 11, Dawson-Dixon cannot show she was prejudiced.

More fundamentally, the record submitted by Dawson-Dixon on appeal does not provide any evidence or explanation of how, why, when, or by whom the initial verdict form submitted to the trial court was modified to yield the final form submitted to the jury. The record reflects that Dawson-Dixon separately submitted at least one other verdict form during the trial proceedings. But it does not appear she filed her later form with the court, as opposed to simply presenting it informally during trial. Nor does the record show how (or if) her later form differed from the initial proposed form. The record does not eliminate the possibility that the verdict form ultimately given to the jury was the later one offered by Dawson-Dixon.

In sum, Dawson-Dixon asserts there was error in the verdict form, but failed to point to anything in the record showing who was responsible for the form submitted to the jury that contained the supposed error. In the absence of a complete record, a reviewing court will not presume error. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295–1296.) Further, the doctrine of invited error might apply, as the record shows Dawson-Dixon participated in the preparation and approval of the verdict form. Finally, given that Dawson-Dixon's closing argument did not reference her breach of contract claim against Steer or ask for any damages resulting from that alleged breach of contract claim, she has not shown prejudice that would require reversal.

DISPOSITION

The judgment is reversed, and the matter is remanded for a new trial on the limited issue of damages.  The judgment is affirmed on all other claims.  Neither party shall recover their costs on appeal.


GOODING, J.

WE CONCUR:


MOORE, ACTING P. J.


MOTOIKE, J.