Filed 3/13/25  In re A.D. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.D., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>P.W.,<br><br>        Defendant and Appellant. | A169677, A170451<br><br>(Alameda County<br>Super. Ct. No. JD-035710-01) |

BY THE COURT:

The petition for rehearing filed on March 11, 2025, is denied.

It is ordered that the opinion filed February 26, 2025, be modified as follows:

On page 16, insert new footnote at the end of the first complete paragraph (following the sentence "This was certainly substantial evidence that Mother disturbed the minor's peace.") that reads as follows:

"For the first time in her reply brief, Mother argues that requiring only proof that a party disturbed a minor's peace is incompatible with common law and the constitutional rights and privileges of parenthood.  As this argument was raised belatedly in the reply brief, we need not consider it.  (*Heiner v.*

1

*Kmart Corp.* (2000) 84 Cal.App.4th 335, 351; *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10; *Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3.)"

There is no change in judgment.

Date: _____                    _____HUMES_____
                                                                        Presiding
Justice

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re A.D., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>      Plaintiff and Respondent,<br>v.<br>P.W.,<br><br>      Defendant and Appellant. | A169677, A170451<br><br>(Alameda County<br>Super. Ct. No. JD-035710-01) |

Shortly after appellant P.W. (Mother) took her son, A.D., to an office of the Federal Bureau of Investigation (FBI) to ask them to investigate an injury that there was no evidence the minor had actually suffered, the son was removed from her care.  The juvenile court ultimately issued a restraining order prohibiting Mother from most contact with the minor, sustained jurisdictional allegations that Mother's mental health prevented her from adequately caring for her son, and limited Mother's educational rights.  In these consolidated appeals, Mother claims that there was insufficient evidence to support these orders.  We disagree and affirm.

1

# FACTUAL AND PROCEDURAL BACKGROUND

Mother was born in India and came to the United States in 2006. She was a social person but started exhibiting signs of mental distress at the beginning of the COVID-19 pandemic when she was unable to go out with friends. She also lost around 30 pounds in a short period of time.

According to Mother, the then five-year-old minor told her he hit his head in late November or early December 2020 while at a park. Minor's father (Father, who is not a party to this appeal) was not aware of any such incident and testified that the minor never suffered a head injury. According to Mother, though, she started noticing physical changes in the minor, such as restlessness, trouble listening, and a sore throat. She also observed that the minor's speech "completely changed" such that it was less "kiddish" and "more thinner," and he was able speak a Hindi dialect he was previously unable to articulate. He also became more skilled at karate the same month of the incident at the park, according to Mother. Mother also became concerned that after the minor hit his head, his feet did not grow for the following two years.

According to Mother, the minor had "[n]ever in his life" experienced bruising before his head trauma, but after the incident bruises started to appear "all over the [minor's] body [in] unusual spots." Also according to Mother, the minor sometimes did not recognize her, and she had trouble getting his attention. After she saw fresh blood in the minor's left ear, she made an appointment with an ear specialist in April 2021.

At another doctor's appointment, Mother raised the possibility of the minor undergoing an MRI, but the doctor said that would involve placing the minor under anesthesia and was unnecessary. The doctor also told Mother it

was unnecessary for the minor to receive neurological imaging because he showed no signs of neurological dysfunction. The doctor asked to meet with Father to check whether he agreed with Mother's assessment that the minor needed an MRI, and Father told the doctor that the minor was "perfectly fine." Father also told the doctor that he was concerned that Mother might be having delusions and that she sometimes slept in their garage wearing a helmet.

A pediatrician who first examined the minor in November 2021 saw what appeared to be eczema on the minor's skin, and she also noticed "developmentally appropriate" bruises on the minor's shins. The doctor told Mother that it was normal for active boys such as the minor to get bruises on their shins. Father likewise believed that the minor's bruises were not out of the ordinary for a child who spent hours at a time at the park. He also did not believe that there was a connection between a head injury and the bruising the minor sometimes experienced. Father did not always attend the minor's doctor's appointments since he did not believe the minor was suffering serious issues. Despite her conclusion that the minor appeared healthy, the new pediatrician ordered a lab test to see if the minor was susceptible to easy bruising or bleeding. After Mother later requested that the doctor perform additional lab tests on the minor, the doctor canceled the original lab order because she apparently received information that Mother was possibly "over-medicaliz[ing]" the minor.

In January 2022 the pediatrician met again in person with Mother and the minor, with Father on the phone, and explained that it was unnecessary to conduct lab work on the minor. Mother, however, was "fixated" on lab work and "very, very insistent" that lab tests be conducted. The pediatrician ultimately conducted the requested tests. They revealed that the minor's

vitamin D was low, but other results were in the normal range. The pediatrician recommended that the minor take a supplement and eat more foods containing vitamin D. During subsequent appointments, Mother "very frequently" sought to have the minor undergo an MRI.

At one point Father went to the Fremont police department and was told that they could not take action regarding Mother if no one was being physically hurt. When Father asked if he could take the minor somewhere else, police told him that would be a crime. Later, Father called the police to the family home after he heard the minor crying because Mother was talking to him to the point he (the minor) could not sleep after his bedtime. Mother and Father started to argue when Father told his wife to stop talking to the minor. Father called 911 because Mother was yelling so loudly.

Mother reportedly reached the point where she was telling her son he was a "robot," and she started scheduling "excessive medical appointments" for him. Respondent Alameda County Social Services Agency (Agency) became aware of the family around the beginning of 2022, when the minor was six years old. Mother was reportedly taking him out of school frequently for unnecessary medical appointments and restricting what he could eat at school. The Agency offered informal family maintenance services to Mother and Father starting in January 2022, but the family refused voluntary services and they were terminated.

Mother, Father, and the minor visited the minor's pediatrician again in March 2022. The doctor observed that the minor's eczema was healing. Mother, though, was "very concerned about his skin" and worried that there were unexplained "injection marks" on him even though the doctor tried to explain that what she was seeing was most likely eczema.

4

In May 2022 Mother noticed "a lot" of bruises on the minor's legs and chest while she was giving him a bath after school.  She called 911, and police came to their house and took pictures of the minor's bruises but told Mother they (the bruises) were not related to abuse.  Mother also took the minor to the pediatrician to discuss new bruising on the minor.  The doctor noticed large bruises on the minor's shin and chest.  The doctor was not concerned about the bruise on the minor's shin but was somewhat concerned about the bruise on the chest, which could possibly be the result of non-accidental trauma.  Mother expressed concern that someone was cutting out the minor's muscles and replacing them in order to conduct research, and she asked that an MRI be done on him.  The doctor was concerned that Mother was possibly having delusions.  She (the doctor) did not think that Mother's descriptions were reliable, and she asked that Father be present at the next appointment, which occurred two days later.  Father explained that the bruise on the minor's chest was the result of him being pushed at school.

Later that year, starting in around August 2022, Mother became concerned about the minor experiencing gastrointestinal issues, such as diarrhea, stomach cramps, and blood in his stool.  She started taking pictures of the food she gave him, and she kept records of everything he ate.  Mother also brought the minor to two different doctors about the stomach issues.  She eliminated gluten from his diet, and she later testified that she did this at the recommendation of a doctor.  Mother had a celiac test done on the minor in September that revealed he did not have celiac disease.  She continued to restrict gluten from the minor's diet because she was concerned it was causing the minor to suffer eczema, boils, and fungal infections.  She also was concerned that after the minor ate school lunches that contained gluten, he had blood in his stool.  She sometimes tracked his bowel

5

movements and took pictures of them. Mother also restricted dairy in the minor's diet even though testing revealed that he did not suffer lactose intolerance. She was concerned that eczema caused by allergies made the minor's lips change shape. Around this time she told the minor's pediatrician that she believed a birthmark on the minor was disappearing.

Father continued to be concerned about Mother's mental health but did not attend all the minor's medical appointments even though a family safety plan called for him to be present. A physician spoke with a social worker in November 2022, raising concerns that Mother was scheduling multiple unnecessary appointments for the minor, requesting invasive and unnecessary tests for him, and appearing significantly paranoid during visits. Father also was concerned about the doctor's visits because the minor "was fine," and Father "didn't want him to go . . . all the time to [the] doctor just for small, small things. And especially not to . . . [the] emergency room, or specialized doctors, like brain surgeon, neurosurgeon, or something like that. Not to those kinds of doctors, because if there's any problem, I would have known if there's any problem with him."

Also around this time, Mother went to the Fremont police department with the minor to ask if they had any reports from the park near the time the minor purportedly suffered an injury. Mother had heard that "a big fight happened" that involved children at the park, but the police "didn't share anything" with her. After she did not receive a response from the police that satisfied her, Mother contacted U.S. marshals about her "civil rights," and the marshals told her she could bring her complaints to state or federal authorities. She contacted the state Attorney General's Office, and they told her to contact a private attorney.

Then in November 2022 Mother took the minor to the San Francisco office of the FBI to report that the minor had unexplained injuries and had suffered severe memory loss since being hurt in the park. She also raised concerns with the FBI about some of the minor's friends and their parents as well as "political" concerns she had about some of them.[1] Mother also told the FBI she wanted to know why parents were complaining about the minor. She felt it was her job "to bring all the loose threads which I know to give it to them," and it was the FBI's job to "investigate." After Mother's visit to the FBI, police conducted a welfare check on the family home.

The Agency filed a dependency petition in December 2022 alleging that the minor was a child described by Welfare and Institutions Code section 300,[2] subdivisions (b)(1) (failure to protect) and (c) (serious emotional damage). At the time the petition was filed, Mother was alleged to have taken the minor to 18 medical appointments in the previous year despite doctors saying there was "no medical necessity" and the minor was healthy. The minor was ordered detained and placed with a paternal aunt.

Mother declined to participate in an initial team meeting in January 2023. Father participated. He said he would take care of the minor's future medical appointments, and he also said he would encourage Mother to get therapy.

---

[1] The Agency reported that Mother told the FBI that the minor was having brain research conducted on him without her permission. County counsel and the juvenile court questioned her at length about this topic. Mother first testified that "I never said that like the way you [county counsel] are describing" but acknowledged that she discussed research being conducted on the minor. Under questioning by her attorney, Mother testified that one of the minor's doctors had suggested that she enroll him in a study at Stanford University.

[2] All statutory references are to the Welfare and Institutions Code.

Following various continuances and witness testimony taken over several court days, it took a year for the case to reach disposition. Early in the case, the Agency obtained the minor's voluminous medical records dating back around four years.

One of the first visits supervised by the relative caregiver reportedly went well, except Mother started checking the minor for rashes, bumps, and bruises as the visit was about to end. She continued to check the minor and take pictures of him even after he protested and the caregiver asked her to stop. At another visit Mother started shouting when she was asked not to take pictures of the minor's skin, but Mother calmed down and the rest of the visit went fine. But at a subsequent visit to a bowling alley and restaurant, Mother again became agitated over what she claimed were rashes and bruises on the minor. The caregiver ultimately asked that she not be the one to supervise visits since Mother would yell at her and accuse her of being a criminal when the caregiver asked Mother to stop examining the minor's arms and legs for rashes when they were in public.

During a February 2023 phone call with the social worker, Mother said no doctor had ever told her to stop bringing her son to medical examinations or that she was seeking unnecessary treatment. At an in-person meeting with social workers that same month, Mother provided a detailed history of the minor's medical history and explained she was skeptical of doctors' explanations that her son's bruises were caused by play. At a separate team meeting in February, Mother said she did not need therapy or a mental-health assessment.

The Agency learned that Mother had visited the minor's school in March 2023. The social worker tried to speak with the school principal about the incident but was not able to reach her before the filing of a March 2023

8

addendum report. The social worker spoke instead with a member of the front office staff who said she saw Mother on school grounds the previous day and that Mother spoke with the principal "outside in front of the school." The staff member also said that Mother "ha[d] come by periodically since [the minor] ha[d] been placed in the home of the paternal aunt. . . . [and] ha[d] 'walked by' while [the minor] and his class [were] outside at recess after lunch," apparently viewing him from a public park. The staff member reported that before Agency intervention, Mother "would sit on the benches every day and watch her son at recess," an account that was confirmed by the minor's teacher. Apparently after the minor's removal from the family home, Mother "ha[d] only 'walked by' when [the minor was] outside at recess." Mother later testified that it was "[her] neighborhood," that when she was in the area "I cannot close my eyes while walking [next to the school]," and that "I will definitely look around." The minor apparently later changed schools.

Before Agency intervention, Mother instructed the minor's school not to feed the minor school lunches because of allergies, but after the minor started living with his aunt he ate school lunches with no issues. The minor's teacher reported that the minor was "like a different child" after being removed from his parents' care, because he was "happier, more engaging, able to concentrate and has focus in class." The minor improved academically and also made a group of friends.

Around this same time, Mother returned to the FBI office in San Francisco to ask for follow up on her concerns. She discussed whether "government agencies" might be causing her son's bruises, along with other topics.

Father secured separate housing, and the Agency requested at a hearing in March 2023 that he be permitted to have a 14-day trial overnight

visit with the minor. The juvenile court was concerned that a safety plan first be put into place. The court made clear that Mother should not have access to the minor even though he would be living with Father. Addressing Mother, the court stated, "You can't just show up. And if you do, that means I have to remove [the minor] again, which will be more traumatic for him and cause him more harm. So I want to be really clear about what that means for both of you [Mother and Father]. . . . [¶] So if the Agency finds that that discretion should be used, and dad brings [the minor] into his home and allows mom to have unfettered or unsupervised access to him, or mom keeps showing up at the house and the Court finds out, it will be an automatic I'm ordering the Agency to remove [the minor] from your care." The court was further concerned with Mother's conduct at the hearing, since she (Mother) appeared to lack understanding about court directives, and she talked over people.

The Agency submitted a proposed safety plan that called for Father to reside at a residence separate from Mother and to keep the address of the new residence confidential from Mother. The plan also contemplated Father obtaining a stay-away restraining order protecting the minor from Mother and directing that she stay away from the minor's residence and school. Consistent with the plan, Father submitted a request for a temporary restraining order (TRO) protecting both him and the minor, which the juvenile court granted.

At a hearing in late March 2023, the juvenile court granted the Agency discretion to place the minor with Father in light of the safety plan and the TRO, and the minor was placed with Father around this time. The court then scheduled a hearing on the permanent restraining order. Before the start of the hearing on whether to grant a permanent restraining order, the

10

TRO was modified so that it covered only the minor so that the parents could communicate without violating an order.

The Agency recommended in April 2023 that Father and the minor receive family maintenance services and that Mother be provided with informal child welfare services. At a brief hearing in May 2023, the juvenile court ordered that the Agency provide an opportunity for Mother to undergo a psychological evaluation, but Mother said she was unwilling to undergo one.

The contested hearing on jurisdiction/disposition and the restraining order began in June 2023 and was held over several days in June, July, August, September, November, and December 2023. County counsel questioned Mother about her perceptions of the minor's medical needs, as set forth above. Mother denied that she believed that experiments were being conducted on the minor. She acknowledged that she had taken the minor to several medical appointments between March 2021 and November 2022, and that she took the minor out of school six times to attend appointments. Father and the assigned social worker also testified.

Before a continued hearing began in late June, Mother's counsel requested that Mother's visitation be increased from twice a week to four times a week. In opposing the request, county counsel reported that Mother had declined family counseling, individual therapy, or any type of psychiatric evaluation. The juvenile court denied the request.

At a brief hearing in October 2023, the juvenile court ordered the Agency to make a referral for Mother to receive a psychiatric evaluation, and Mother apparently said she was willing at that time to receive one. Mother also was referred for therapy and parenting classes. As of a hearing held in late November 2023, though, Mother apparently had declined the psychological evaluation and therapy.

11

In closing arguments, county counsel focused on the reasons the juvenile court should take jurisdiction. The minor's counsel agreed that the court should sustain the allegations of the dependency petition. The court asked counsel to confirm whether the minor also requested a restraining order, and counsel confirmed the request in order to protect the minor from harassment. Counsel argued that the restraining order was requested because of concerns over Mother showing up at the minor's school "[e]xcessively" both before and following removal. Counsel stressed that the behavior stopped only after the minor was placed with Father in a confidential location "and moved to a confidential school." Mother's counsel, by contrast, argued that Mother entered school grounds only once after removal. Father's counsel's brief closing argument did not focus on the restraining order.

Following closing arguments, the juvenile court observed that although there was no formal evaluation of Mother, "her behaviors are so outside of the normal that I think it would be easy for a Court, a trier of fact, whether it be a jury or a Court, to find that the mother[ is] suffering from some level of [a] mental health issue." The court concluded that based on the minor's medical records alone, there was "no question" that taking jurisdiction was appropriate. That task was "even easier," according to the court, because "[w]hether it be on the stand, or sitting across from me next to her attorney, . . . the behavior she exhibits makes it clear that there is a mental health diagnosis that she's unwilling to deal with." The court observed that "I think that there's not really a Judge that I've met that wouldn't do the same thing I'm doing based upon the evidence I have in front of me" and that "this doesn't get better unless you [Mother] seek assistance or help."

The court found by clear and convincing evidence that the minor was a child described by section 300, subdivisions (b)(1) and (c).  The court also found by clear and convincing evidence that it was necessary to remove the minor from Mother's care.  The minor was to remain in Father's care, with the Agency to provide family maintenance services.

As for a permanent restraining order, the juvenile court entered one "based upon the evidence heard during the course of these proceedings."  The order directs that Mother stay at least 100 yards away from the minor as well as his home, school, or childcare.  The restraining order was to remain in place until December 18, 2026.  Mother was permitted to have supervised visitation with the minor at least once a week.  Mother appealed. (No. A169677.)  Neither the minor nor Father has filed a brief in this court.

Meanwhile in the juvenile court, the minor's counsel sought to limit Mother's educational rights.  At the time of the hearing on the request, Mother apparently had not taken any steps to address her mental health challenges, as called for in the Agency's case plan.

At the hearing on the motion, Father reported that after he did not trim the minor's fingernails, the minor cut himself under his nose, and it took about a week to heal.  Mother characterized this as a "complete lie" and said it was "not a scratch" because the minor had been bleeding for nine days. The court asked Mother to leave the courtroom after she told the judge that the judge needed "treatment," "ha[d] delusion[s]," and was "mentally sick." After Mother left the courtroom, the juvenile court stated, "I think we should be cognizant of the fact that the mother's mental health is deteriorating.  It has gotten worse than the last time we were here, which was about maybe three months ago.  That level of spiral makes me uncomfortable, even potentially with the visitation."  The court further observed that "it is clear to

13

me that the mother is having some level of disconnect from reality at this point, or psychotic break."

The court stated that Mother's behavior "just ma[de] it a much easier decision" regarding limiting educational rights, because it did not appear "that she can handle herself emotionally and mentally such that she should be involved in [the minor's] educational decisions." The juvenile court issued an order maintaining Father's educational rights but limiting those of Mother. Mother appealed.[3] (No. A170451.) This court consolidated A169677 and A170451.

## II.
## DISCUSSION

### A. *The Juvenile Court Did Not Err in Imposing a Restraining Order (No. A169677).*

Mother argues in her first appeal that the juvenile court erred when it issued the three-year restraining order protecting the minor. Although this case presents a close question, we affirm.

The restraining order was issued under section 213.5. Subdivision (a) of the statute permits a juvenile court in a dependency action to enjoin a person from, among other things, "harassing" or "disturbing the peace of [a]

---

[3] The juvenile court later dismissed dependency proceedings and granted legal and physical custody to Father. Mother's appeal from the dismissal order is pending in this court. (No. A171683.)

child."[4]  (See also Cal. Rules of Court, rule 5.630 [juvenile court's authority to issue restraining order].)  While evidence that a restrained person previously has inflicted harm on a minor is sufficient to justify a restraining order under section 213.5, "issuance of a restraining order does not *require* such evidence.  [Citations.]  Nor does it require evidence of a reasonable apprehension of future physical abuse.  [Citations.]  There need only be evidence that the restrained person 'disturbed the peace' of the protected child." (*In re Bruno M.* (2018) 28 Cal.App.5th 990, 997.)  "In this context, *disturbing the peace* means ' "conduct that destroys the mental or emotional calm of the other party." ' " (*Ibid.*)

As both parties observe, different courts have applied different standards of review when reviewing a restraining order in a dependency action.  (Compare *In re B.S.* (2009) 172 Cal.App.4th 183, 193 (*B.S.*) [reviewing issuance of restraining order for substantial evidence] with *In re Carlos H.* (2016) 5 Cal.App.5th 861, 866 [factual findings supporting restraining order reviewed for substantial evidence, while issuance of order reviewed for abuse of discretion].)  The approach in *Carlos H.* is consistent with our Supreme Court's approach to reviewing decisions made under the dependency statute governing selecting a permanent plan (§ 366.26).  In *In re Caden C.* (2021) 11 Cal.5th 614, the court held that the factual elements of

---

[4] The court may (1) enjoin a person from "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the Penal Code, destroying the personal property, contacting, either or directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the child or any other child in the household; and (2) exclude[] a person from the dwelling of the person who has care, custody, and control of the child." (§ 213.5, subd. (a).)

the beneficial-relation exception to adoption are reviewed for substantial evidence, while weighing the various factors of applying the exception is reviewed for abuse of discretion. (*Id.* at pp. 639–640.) A similar approach is appropriate here, where the basis for a restraining order involves "essentially a factual determination," and the decision to impose a restraining order involves "a delicate balancing of these [factual] determinations as part of assessing the likely course of a future situation that's inherently uncertain." (*Ibid.*) And, in any event, "the practical difference between the standards is not likely to be very pronounced." (*Id.* at p. 641.)

Mother first contends that there is insufficient evidence that without an injunction the minor's "safety would be jeopardized." The juvenile court considered abundant evidence that Mother's perception of the minor's heath was disconnected from reality; that she discussed those views in the minor's presence in the family home, at doctor's appointments, and during a visit to the FBI; that she withheld certain foods from him despite being told it was unnecessary to do so; that she inspected the minor for perceived health problems during visits even after she was asked to stop—conduct that caused the minor distress; and that Father on one occasion called police to the home because of Mother's behavior in front of the minor. This was certainly substantial evidence that Mother disturbed the minor's peace.

Mother seems to suggest that the juvenile court was required to have evidence that the minor would suffer physical abuse absent a restraining order. She relies on *In re N.L.* (2015) 236 Cal.App.4th 1460 (*N.L.*), where the juvenile court issued a restraining order protecting a father and his child after the child's mother threatened the father, hit and scratched him, pulled his hair, and threatened to kill him. (*Id.* at pp. 1463, 1465.) The *N.L.* court affirmed the restraining order as to the father but reversed it as to the minor

16

since there was no evidence that the mother had engaged in any violent threats or conduct toward the minor, no such threats or conduct had taken place in the minor's presence, and visits between the mother and her daughter went well. (*Id.* at pp. 1468–1469.) In other words, in *N.L.* there was no underlying justification to protect the minor, whereas here there was evidence that Mother was disturbing the peace of the minor (§ 213.5, subd. (a)).

Mother claims this case is analogous to *N.L.* because in both cases there was evidence that the visits with the minor went well. (*N.L. supra*, 236 Cal.App.4th at pp. 1468–1469.) But, as *N.L.* itself acknowledged, "[m]onitored visitation of a child is not incompatible with a restraining order." (*Id.* at p. 1466; see also *B.S.*, *supra*, 172 Cal.App.4th at p. 188 [upholding restraining order that called for no contact except as required for visitation].) The juvenile court considered evidence that Mother was preoccupied with the food the minor ate at school and showed up at the school to ask about it. Although supervised visitation may have gone well, that did not preclude concern that Mother would continue to interfere with the minor's school day or otherwise seek out the minor to oversee his diet.

We are sympathetic to Mother's argument that the physical danger posed to the minor was less pronounced than that present in other cases that upheld restraining orders. (E.g., *B.S.*, *supra*, 172 Cal.App.4th at p. 186 [father threw mother on top of their baby, hit the mother in the eye, and threatened to kill her]; *In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1512 [grandmother concealed herself at scheduled visitation, hired a private detective to spy on minors, and showed up unannounced at minors' schools to try to make unauthorized contact with them]; *In re Cassandra B.* (2004) 125 Cal.App.4th 199, 204–205 [mother called home of daughter's caretaker so

17

frequently she filled voicemail system, went to minor's residence and school, and yelled at daughter, who said she was afraid of her mother].) But throughout the proceedings below, the juvenile court expressed its concern about Mother's inability to follow directions or to appreciate the effect that her behavior was having on her son. Under these particular circumstances, imposing a restraining order did not amount to an abuse of discretion.

We are not persuaded by Mother's reliance on *In re C.Q.* (2013) 219 Cal.App.4th 355 (*C.Q.*). There, the social services agency became involved with a family after a report of domestic violence between a mother and father in front of their 12-year-old daughter, while their other three daughters also were in the home. (*Id.* at p. 357.) The father reportedly struck the mother with a closed fist, and the 12 year old tried to intervene but was not injured. (*Id.* at p. 358.) The daughters became upset when the mother reported the domestic violence because they did not want their father to have to leave the family home or go to jail. (*Id.* at pp. 357–358.) An investigation revealed previous incidents of domestic violence and reports of the mother frequently having bruises. (*Id.* at pp. 359–361.) The juvenile court issued a restraining order protecting the mother and her three minor daughters. (*Id.* at pp. 361–363.) The appellate court reversed the order as to the daughters since the children said they wanted visits with the father and were not afraid of him, and there had been no further reports of domestic violence, which meant there was insufficient evidence that the daughters' (as opposed to the mother's) safety might be in jeopardy. (*Id.* at p. 364.)

Mother here argues that her situation is analogous to the one presented in *C.Q.*, but we disagree. First, we question whether *C.Q.* truly viewed the evidence in the light most favorable to respondent (*C.Q.*, *supra*, 219 Cal.App.4th at p. 364), since there was evidence that supported the

18

restraining order as to the daughters. But in any event, the court noted that the father did not challenge the portion of the restraining order that required him to stay away from the mother and the family home where mother and the children lived. (*Id.* at p. 364.) Here, by contrast, there would be nothing preventing Mother from contacting the minor since the protective order does not cover Father, the minor's primary caretaker.

Although a different juvenile court might have reached a different conclusion in this case, we cannot say that the imposition of a restraining order was arbitrary, capricious, or patently absurd, or that under all the evidence no judge could reasonably have imposed the restraining order. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 641.)

### B. Substantial Evidence Supports the Juvenile Court's Jurisdictional Findings (No. A169677).

Mother next argues that the juvenile court's jurisdictional findings were not supported by substantial evidence. The court found that the minor was a child described by section 300, subdivisions (b)(1) and (c). We must affirm if there is substantial evidence to support the court's order. (*In re A.G.* (2013) 220 Cal.App.4th 675, 682 (*A.G.*).) That is, we must affirm if there is evidence that is reasonable, credible, and of solid value to support the order, resolving all conflicts in favor of the order and deferring to the juvenile court's determination of credibility. (*Id.* at pp. 682–683.) " 'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' " (*In re I.J.* (2013) 56 Cal.4th 766,

19

773.) Because we conclude that substantial evidence supported jurisdiction under section 300, subdivision (b)(1), we affirm. (See *In re A.J.* (2011) 197 Cal.App.4th 1095, 1103 [affirming jurisdictional order after considering one of two grounds upon which juvenile court took jurisdiction].)

Section 300, subdivision (b)(1)(D), provides that the juvenile court may take jurisdiction of a minor where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness" as a result of the inability of the parent to provide regular care for the child due to the parent's mental illness. "There are three elements to jurisdiction under section 300: '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness.' " (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1225.) "The third element 'effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur).' " (*In re James R.* (2009) 176 Cal.App.4th 129, 135.)

The juvenile court here sustained allegations that Mother had significant mental-health needs that put the minor at risk of suffering "emotional harm and/or general neglect," as shown by Mother taking him to multiple doctors 18 times in the previous year and requesting "invasive and unnecessary medical tests"; taking him out of school early for doctor appointments, causing the minor to be sad; and taking him to the FBI and making claims that were not supported by evidence. These findings have overwhelming support in the record.

Mother focuses narrowly on whether the requested diagnostic tests and procedures caused, or could cause, the minor harm. Because procedures

deemed medically unnecessary were never actually performed on the minor, and any harm from future procedures done as a result of future medical appointments is wholly speculative, Mother posits, there is insufficient evidence to support the allegations under section 300, subdivision (b). But the harm the minor suffered was connected, not so much to the requested tests, but to the fact that he was frequently taken out of school to attend doctor's appointments where the tests were requested, Mother's perceptions of her son's medical needs did not appear connected to reality to the point where she took him to the FBI to discuss her concerns, and his parents fought over how Mother handled the minor's needs. After the minor was removed from Mother's care, his teacher reported that he was "like a different child" and was "happier, more engaging, [and] able to concentrate and has focus in class," a sign he suffered harm when in Mother's care.

True enough, the fact that Mother struggles with her mental health "is not the end of the story" because the Agency " 'ha[d] the burden of showing specifically how the minor[] ha[s] been or will be harmed and harm may not be presumed from the mere fact of mental illness of a parent.' " (*A.G.*, *supra*, 220 Cal.App.4th at p. 684.) Here, the Agency proved that Mother's mental-health struggles caused disruption to the minor and led him to miss school. This case is thus distinguishable from *A.G.* and other cases that Mother relies on where a parent was shown to have a mental illness, but not that the condition affected their children. (*A.G.* at p. 684 [no harm to minors when they were left alone with mentally ill mother and father was able to protect them from her]; *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003 [mother's drug use did not support jurisdiction where only possible effect on minor was school tardiness, a speculative result that did not amount to serious risk of harm]; *In re Janet T.* (2001) 93 Cal.App.4th 377, 388–389 [petition alleged

21

that mother had mental problems and failed to ensure children's regular school attendance, which did not amount to risk of serious physical harm or illness].)

We disagree with Mother's contention that this case is similar to *In re Phoenix B.* (1990) 218 Cal.App.3d 787. There, a social services agency took custody of a minor after her mother was involuntarily hospitalized following a nervous breakdown. (*Id.* at pp. 789–790.) While the mother was still hospitalized, the father—who was never married to the mother—came forward to take care of the minor and moved out-of-state with her. (*Id.* at p. 790 & fn. 3.) The juvenile court later granted a request to dismiss the petition, and the appellate court affirmed. (*Id.* at pp. 789–791.) The court concluded that the agency had properly concluded that there were no conditions that warranted continuing detention, and the mother's remedy was to seek custody through family-law proceedings. (*Id.* at pp. 794–795.) True, Father here was ultimately able to take custody of the minor and adequately provide for his care. But this was accomplished only after he moved to a new residence apart from where he had been living with Mother, and after the Agency put into place a safety plan to ensure that he did not bring the minor into contact with Mother except during approved visitation. The case is thus distinguishable from *Phoenix B.*, where the father had not been coparenting the minor and there was thus no need for juvenile-court oversight.

We agree with respondent that this case is more akin to *In re Travis C.*, *supra*, 13 Cal.App.5th 1219. There, the mother suffered "serious mental health problems, including psychotic episodes," which "caused her to become delusional and paranoid and act in ways that scared [her] children." (*Id.* at p. 1221.) Although the mother apparently never physically hurt her children,

she once threatened suicide while they were in her care, and the maternal grandparents were concerned that the mother sometimes drove the children alone in her car while she was showing symptoms of her mental illness. (*Id.* at pp. 1221–1222.) In affirming jurisdictional findings, the court noted that it was unnecessary for the juvenile court and the social-services agency "to precisely predict *what* harm will come to [the minors] because Mother has failed to consistently treat her illness. Rather, it is sufficient that Mother's illness and choices create a substantial risk of *some* serious physical harm or illness." (*Id.* at pp. 1226–1227.) Likewise here, given Mother's past over-medicalization of the minor and failure to grasp the effect this had on her son, sufficient evidence supports the jurisdictional findings.

Finally, Mother argues that if we reverse the jurisdictional order, we must also reverse the dispositional order. Because we affirm the jurisdictional order, we affirm the dispositional order as well.

### C. *The Juvenile Court Did Not Abuse Its Discretion When It Limited Mother's Educational Rights (A170451).*

In appeal No. A170451, Mother argues that if the jurisdictional order is reversed in A169677, the order limiting her educational rights must be reversed as well. Again, because we affirm in A169677, we affirm in A170451 as well.

Parents have a constitutionally protected liberty interest in directing the education of their children, but a juvenile court may limit the educational rights of the parent of a dependent minor (§ 361, subd. (a)(1)). (*In re R.W.* (2009) 172 Cal.App.4th 1268, 1276.) We review the juvenile court's order limiting Mother's education rights for abuse of discretion (*id.* at p. 1277) and find no such abuse since the order was entered consistent with the orders we already have affirmed.

## III.
### DISPOSITION

In A169677, the protective order and jurisdictional and dispositional findings are affirmed.

In A170451, the order limiting Mother's educational rights is affirmed.

_____

Humes, P. J.

WE CONCUR:

_____

Banke, J.

_____

Langhorne Wilson, J.

*In re A.D.*  A169677, A170451